EL PUEBLO DE PUERTO RICO, apelado, *v.* ENRIQUE MELIÁ LEÓN, acusado y apelante.

*Número:* CR-93-114 . *Resuelto:* 30 de junio de 1997

*José M. Sagardía Pérez*, abogado del apelante; *Jacqueline No-
vas Debién, Subprocuradora General, y Rose Mary Cor-
chado Lorent, Procuradora General Auxiliar*, abogadas de
los apelados.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión
del Tribunal.

Enrique Meliá León, ex Teniente-Coronel de la Policía
de Puerto Rico a cargo de la Superintendencia Auxiliar de
Tránsito, fue juzgado por tribunal de derecho y hallado cul-
pable por tres (3) delitos de soborno agravado y uno (1) por
violación al inciso (c) del Art. 3 de la Ley Núm. 33 de 13 de
julio de 1978, según enmendada, conocida como Ley Con-
tra el Crimen Organizado y Lavado de Dinero del Estado
Libre Asociado de Puerto Rico, 25 L.P.R.A. sec. 971 *et seq.*
(en adelante la Ley Contra el Crimen Organizado). Incon-
forme con el fallo y la sentencia emitidos por el entonces
Tribunal Superior, Meliá León apeló ante nos.

Al evaluar los méritos de los señalamientos de su ape-
lación, debemos considerar el alcance de la disposición de
la Ley Contra el Crimen Organizado que penaliza la par-
ticipación de una persona en los asuntos de una empresa
mediante actividades que constituyan un patrón de crimen
organizado. Debemos, así, precisar los contornos de los
conceptos centrales del Art. 3(c) de dicha ley, 25 L.P.R.A.
sec. 971b(c).

Evaluada la prueba de cargo presentada y los méritos
de los planteamientos del apelante, confirmamos.

## I

Conforme surge del testimonio que ante el entonces Tribunal Superior, Sala de Mayagüez (Hon. Hiram Torres Rigual, Juez), prestaron los testigos de cargo, versión que le mereció entera credibilidad al juzgador de los hechos, en enero de 1991 un *Task Force* compuesto por el Negociado de Investigaciones Especiales (en adelante el N.I.E.) y el Servicio de Aduana federal en Mayagüez, realizó una investigación sobre el trasiego de cocaína desde Colombia a Puerto Rico. La investigación estaba centrada en una organización criminal que operaba en el área suroeste de Puerto Rico, de la cual se había identificado a Israel Sanabria como su jefe y a Ernesto Figueroa Ramos c/p Nesti, como uno de sus integrantes.

Como parte de la investigación, el *Task Force* utilizó los servicios de varios agentes encubiertos que lograron infiltrarse en el grupo investigado y cuyos testimonios fueron presentados como prueba de cargo. Entre éstos, el testimonio principal lo brindó Edgar Candelaria Soto, agente del Negociado de Drogas y Narcóticos de Mayagüez de la Policía de Puerto Rico.[1]

Según el testimonio de Candelaria Soto, en julio de 1991 recibió instrucciones de infiltrarse en el grupo que estaba siendo investigado. El plan de las autoridades consistía en que se hiciera pasar por un capitán de embarcaciones dedicado al contrabando de drogas, armas e indocumentados para que la organización investigada lo incluyera en un plan gestado para traer ilegalmente a Puerto Rico desde aguas de la República Dominicana a Alcides Weissman, un colombiano que, según información recibida, era represen-

---

[1] La prueba de cargo estuvo constituida por los testimonios de los agentes Excer Quiñones Hernández, Edwin L. Hernández, Edgar Candelaria Soto, José Pascual Rosa Vega, Francisco Carbó Martí y Juan Aponte Quiñones.

tante del Cartel de Medellín. Un agente ya infiltrado sirvió de enlace entre Candelaria y la organización.([2])

La operación fue realizada según lo planificado y Candelaria participó en la introducción ilegal de Weissman a Puerto Rico. Luego de ello, Candelaria mantuvo comunicación con Figueroa Ramos e incluso llegó a reunirse con éste y Weissman. En una de estas reuniones Weissman invitó a Candelaria a Colombia y a la República Dominicana para que conociera a varias personas. Fue en esa reunión que Figueroa Ramos le indicó que para gestiones futuras tenía los contactos en Puerto Rico "porque conocía a un sargento de la Policía de Puerto Rico que es compadre del Coronel Enrique Meliá, que es persona con mucho poder y que ambos bregan". Exposición Narrativa de la Prueba (en adelante E.N.P.), pág. 19. El Sargento de la Policía aludido era Jaime Torres, en ese momento oficial sin rango de ese cuerpo adscrito a la División de Tránsito, Área de Ponce, y quien posteriormente figuró como uno de los coacusados en el proceso seguido contra Meliá León. Según la exposición narrativa de la prueba, esta es la primera ocasión en que se menciona el nombre de Meliá León en el transcurso de la investigación. La admisión en evidencia de esta declaración por voz del testigo de cargo Candelaria fue objetada por la defensa. El tribunal, sin embargo, la aceptó.

Siguiendo instrucciones del *Task Force*, el 14 de septiembre de 1991, Candelaria transportó un supuesto cargamento de armas al pueblo de Cataño. En esa ocasión participaron Figueroa Ramos y Jaime Torres. Al día siguiente se reunió con ambos en Mayagüez y les pagó cuatro mil dólares ($4,000) a cada uno. Además, les indicó que tenía planes de introducir "mil kilos pero que necesitaba

---

([2]) Surge de la exposición narrativa de la prueba que, previo a los hechos que dieron base a la acusación contra Meliá León, Candelaria Soto había participado en más de noventa (90) transacciones de sustancias controladas, entre las cuales se pudo procesar criminalmente entre noventa (90) y cien (100) personas en las regiones de Mayagüez, Aguadilla y en el Tribunal federal de Puerto Rico.

más garantías". E.N.P., pág. 23. Fue entonces cuando el policía Jaime Torres le indicó que en futuras operaciones podía dar garantías con el Coronel Meliá. Íd. Ante objeciones de la defensa, el tribunal de instancia igualmente admitió esta declaración.

El 28 de septiembre de 1991, Candelaria acudió al Pichi's Convention Center de Guayanilla para conocer a Meliá, según lo había acordado con Figueroa Ramos. Surge de la exposición narrativa de la prueba que, antes de esta reunión,

> ... [Figueroa Ramos] le indicó que se lo iba a presentar pero que no le hablara del negocio; que había que hablarle en clave a Meliá porque había otros acompañantes que no se podían enterar; que la clave era decir "camiones" por cargamentos; "cajas de guineo" por marihuana y "plumas" por dinero. E.N.P., pág. 23.

Allí se encontraban el Coronel Meliá León, vestido con su uniforme de Policía, el policía Jaime Torres, Ernesto Figueroa Ramos, otro policía de apellido Rosa y un señor a quien identificó como Toño Pérez. Candelaria indicó que, luego de ser presentado, Figueroa Ramos lo "sacó aparte" para decirle que se acordara de no hablar directamente, que habría una reunión posterior en donde podrían hacerlo. Íd., pág. 24. Durante el transcurso de esa reunión, Candelaria le expresó a Meliá León que tenía un "negocio de camiones" y que "transportaba piezas de máquinas" a diferentes puntos de la Isla. Le dijo, además, que le gustaría que verificara los documentos de sus camiones para asegurarse de que todo estaba bien. Según su declaración, Meliá le preguntó "si tenía muchos clientes" y le recomendó "que buscara clientes grandes y a largo plazo para la estabilidad de su negocio". Íd.

El 4 de octubre siguiente, Candelaria se reunió con Jaime Torres, Ernesto Figueroa Ramos y la hija de éste, de nombre Evelyn Figueroa. Ese día llevaba consigo un maletín con trece mil cuatrocientos dólares ($13,400) para rea-

lizar una supuesta transacción ilegal. Mientras esperaban, les indicó a Torres y a Figueroa Ramos que tenía planificado introducir mil doscientos (1,200) kilos de cocaína al país, para lo cual contaba con dos (2) planes: uno, si Meliá daba protección, y otro, sin la cooperación de éste. Según narró Candelaria, el policía Torres le indicó que Meliá estaba "al tanto de todo y que bregaría pero que tenía que ser poco a poco". E.N.P., pág. 25.

Candelaria solicitó al policía Jaime Torres que llamara a Meliá desde allí para conversar con él. Torres, sin embargo, se reafirmó en que Meliá cooperaría con lo necesario. Ante la insistencia de Candelaria, Torres buscó un pedazo de papel en donde tenía varios números telefónicos. Uno de ellos estaba identificado por la frase "residencia de Meliá", y el otro, por "celular de Meliá". Candelaria marcó ambos números sin lograr comunicación. Entonces, llamó a un tercer número anotado que resultó ser de un sistema de *beeper*, y dejó el mensaje siguiente: "Que llame a Jaime", y dio su número del teléfono celular. Luego de esperar varios minutos sin recibir respuesta, Figueroa Ramos, su hija y Jaime Torres se marcharon del lugar. Veinte (20) minutos más tarde Candelaria recibió una llamada de una persona que, sin identificarse, "preguntó por Jaime". Según Candelaria, la voz era de un hombre, y tan sólo le indicó a éste que "Jaime no estaba".

El 8 de octubre de 1991, Candelaria se reunió con Figueroa Ramos y el policía Torres para coordinar la introducción del alegado cargamento de mil doscientos (1,200) kilos. Preguntó por Meliá, y ellos le indicaron que estaba al tanto de todo. E.N.P., pág. 26.

El 12 de octubre de 1991, Candelaria se reunió en el restaurante La Guardarraya de Yauco con Meliá León, Figueroa Ramos, Evelyn Figueroa y los policías Jaime Torres y Rosa, este último era chofer de Meliá. Candelaria narró que en esa ocasión, Meliá le preguntó sobre cuántos camiones tenía. Según Candelaria, la palabra camiones se refe-

ría a cargamentos de droga. Ese día, Candelaria le obsequió a Meliá una pipa de fumar italiana, marca Aldo Velatti, valorada en ciento setenta y cinco dólares ($175) que fue adquirida con dinero de las autoridades. Ella había sido usada previamente para que pareciera usada. Al entregársela, le indicó a Meliá que "una promesa era una deuda", en alusión al hecho de que en una reunión pasada al ver a Meliá fumando una pipa le dijo que le obsequiaría una que tenía en su casa. Meliá la aceptó y le dio las gracias.

En esa reunión, Candelaria manifestó su preocupación sobre la posibilidad de que sus camiones fueran detenidos por la Policía mientras transitaban por las vías públicas del país. Fue entonces cuando Figueroa Ramos le indicó a Meliá que tenían unos viajes pendientes y que necesitaban su ayuda. En su declaración, Candelaria testificó que Meliá aceptó cooperar con ellos. E.N.P., pág. 27. Expresó, además, que "Meliá lo asesoraba [sobre] cómo mover los cargamentos y que cada cual tenía una labor siendo Jaime y Nesti [Figueroa Ramos] los choferes". Íd. Candelaria pagó la cuenta y salieron del restaurante en dirección hacia un lugar conocido como Géminis. El policía Torres acompañó a Candelaria en el auto de éste. Figueroa Ramos continuó la marcha junto a su hija. Y Meliá León viajó junto a su chofer.

Candelaria narró que en el trayecto, Jaime Torres le indicó que Meliá iba a "bregar con la seguridad en las carreteras cuando se moviera el cargamento" y que Meliá estaba dispuesto a aceptar "un regalito después de mover el cargamento". E.N.P., pág. 27.

El 22 de octubre de 1991, Candelaria recibió instrucciones de sus supervisores para que invitara a Figueroa Ramos a pernoctar varias noches en el Hotel San Juan. Junto a él se encontraba el agente especial del N.I.E. Rafael Valle, a quien Candelaria presentó como su guardaespaldas. El plan del *Task Force* consistía en que los agentes y los

investigados permanecieran varios días allí en espera de una supuesta llamada en la que se les indicaría la fecha cuando llegaría el cargamento de drogas a Puerto Rico. La llamada simulada fue recibida el 24 de octubre, y en ella, supuestamente, se decía que el alegado cargamento llegaría el viernes siguiente.

Recibida la llamada, Figueroa Ramos trató de comunicarse sin éxito con Jaime Torres. Fue entonces cuando Candelaria le indicó a Figueroa Ramos que se comunicara con Meliá. Luego de varias evasivas, Figueroa Ramos tomó el teléfono celular de Candelaria y realizó una llamada supuestamente a Meliá. Al ser contestada, Figueroa Ramos expresó: "te acuerdas de la mudanza que te dije, la vamos a hacer de viernes a sábado". E.N.P., pág. 29.

En esa ocasión acordaron reunirse al día siguiente con Meliá en el Hotel Days Inn de Ponce. Esta reunión, sin embargo, no pudo efectuarse ya que camino al lugar Candelaria recibió una llamada de Figueroa Ramos en la que le indicó que Meliá no podría reunirse con ellos porque se encontraba con unos agentes de la Policía. Según surge de la exposición narrativa de la prueba, Figueroa Ramos "le dijo también que Meliá estaba contento y que le mandaba a decir que fuera con el cinturón puesto, a poca velocidad y que condujera con cuidado porque había muchas patrullas de tránsito en la autopista". E.N.P., pág. 29.

El 26 de octubre de 1991, Jaime Torres, Figueroa Ramos y Candelaria le dejaron un mensaje en el cuartel de Vega Baja para que se reuniera a almorzar con ellos en el restaurante El Fogón, ya que se encontraba en esa municipalidad en gestiones oficiales. Para esa ocasión Candelaria tenía instrucciones de entregarle a Meliá un reloj *Rolex President* de oro con bordes de diamantes como "agradecimiento por su apoyo y asesoramiento". E.N.P., pág. 29.

Cuando Candelaria llegó al restaurante, encontró a Figueroa Ramos esperándolo fuera del negocio. Éste le dijo que Meliá necesitaba cinco mil dólares ($5,000). Candela-

ria le dijo que tan sólo tenía consigo tres mil dólares ($3,000) con instrucciones de entregárselos personalmente a Meliá si fuera necesario.

Al entrar al restaurante, Meliá se encontraba sentado en una mesa junto al policía Rosa, su chofer. Candelaria cumplió con las instrucciones recibidas y le entregó el reloj a Meliá, indicándole que era como "agradecimiento por su apoyo y asesoramiento". Meliá León aceptó el reloj.

Al día siguiente, 27 de octubre de 1991, Candelaria, Figueroa Ramos y el policía Torres se reunieron nuevamente con Meliá León en el restaurante Los Hornos de Lajas. Junto a ellos se encontraba el policía Rosa, chofer de Meliá. Durante el almuerzo, Candelaria señaló que tenía unas piezas que un cliente de Bayamón quería que se las entregara esa noche. Candelaria señaló que Meliá le comentó que "bregara con Jaime que era bien querido en la Policía y que no iba a tener problemas". E.N.P., pág. 30. Entonces, Figueroa Ramos afirmó que había hablado con Meliá, y que éste había reiterado que estaba con ellos. Meliá no rechazó estas aseveraciones.

En un momento mientras se encontraban reunidos, Candelaria se levantó de la mesa y se dirigió al baño del restaurante. Su intención era encender la grabadora que llevaba consigo para grabar la conversación. Sin embargo, Candelaria narró en el foro de instancia que "creyendo que la prendía [la grabadora], la apagó".(³)

Según el testimonio de Candelaria, luego de haber ido al baño, llamó a solas a Meliá y habló sobre el supuesto material que iría a transportar esa misma noche y le dijo que necesitaba que estuviera atento a cualquier eventualidad.

---

(³) La grabadora había sido encendida previamente por Candelaria cuando se dirigía hacia el restaurante Los Hornos, y en ella grabó con su voz la expresión introductoria requerida por ley: se identificó por su nombre, número de agente, fecha, hora e indicó las personas que estarían presentes durante la grabación. Surge de la exposición narrativa de la prueba que, luego de haberla encendido, la grabadora continuó funcionando y grabó todo lo conversado hasta que entró al baño.

Ante todo esto señaló que Meliá le había dicho: "no hay problemas, tú tienes todos mis teléfonos."

Acto seguido, le dijo a Meliá que le tenía "un regalito". Fue a su carro a buscarlo y, al abrir la puerta de éste, se percató de que Meliá lo había seguido y se encontraba tras de él, en el estacionamiento. Candelaria dijo que sacó del auto una bolsa del restaurante McDonalds's que contenía dos mil dólares ($2,000) en efectivo, le mostró el contenido a Meliá, quien al verlo asintió con la cabeza. Meliá tomó la bolsa y se dirigió hacia su vehículo oficial, se montó en él del lado del pasajero y se marchó del lugar junto a su chofer. Lo conversado en esa ocasión no pudo ser grabado, pues como indicamos antes, la grabadora fue apagada. Sin embargo, el hecho de que Meliá recibió una bolsa de papel de manos del agente Candelaria fue corroborado por el policía Juan Aponte Quiñones, quien ese día se encontraba dando vigilancia corroborativa en las afueras del restaurante.

Esa noche, Candelaria se reunió en el centro comercial de K-Mart de Mayagüez con Figueroa Ramos y el policía Jaime Torres. También se encontraban con ellos dos (2) agentes del N.I.E. y dos (2) agentes del F.B.I. Desde allí iniciaron la marcha hacia Bayamón en varios vehículos transportando un supuesto cargamento de drogas y armas. Candelaria viajaba con Torres en una guagua *Mitsubishi* en donde iba el material delictivo suministrado por las autoridades. Los demás viajaban en otros vehículos. Salieron de Mayagüez a la 1:15 de la madrugada del 28 de octubre de 1991, y llegaron a Río Hondo, Bayamón, a las 3:30. Candelaria declaró que durante el viaje el policía Torres expresó que Meliá le había pedido que le dijera que no introdujera cargamentos de domingo a lunes porque en esos días "la F.U.R.A. estaba bien activa". Señaló, además,

que durante el trayecto no vio ninguna patrulla de la Policía y que no llamó a Meliá "porque todo fluyó bien".([4])

El Ministerio Público también llamó a testificar a José Pascual Rosa Vega, quien al momento de los hechos que dieron base al caso, fungió como chofer de Meliá. Al respecto, declaró sobre la reunión efectuada en septiembre de 1991 en el Pichi's Convention Center entre Meliá León y Candelaria. Indicó que en esa ocasión estaban presentes también Figueroa Ramos y el policía Torres. Sobre esa reunión narró que Candelaria dijo que deseaba que Meliá verificara los "papeles" de sus camiones porque no quería "tener problemas con la [P]olicía". E.N.P., pág. 43. Indicó que Meliá le dijo que "con lo que la [P]olicía tenía problemas era con los furgones que no tenían los papeles al día y que lo importante era que tanto los camiones como los furgones, como los choferes, tuvieran todos sus papeles correctos y que no violaran la ley pues así no tendrían problemas". Íd. Narró, además, que ese día Meliá le enseñó una pipa de fumar que le habían obsequiado.

Rosa Vega también declaró sobre la reunión habida en el restaurante La Guardarraya en Yauco. Allí se reunieron Candelaria, Figueroa Ramos, la hija de éste, Jaime Torres

---

([4]) En su testimonio, Candelaria narró un incidente ocurrido el 30 de octubre de 1991 en el que conversó con Meliá León. Según su declaración, ese día recibió instrucciones de acudir al Victory Shopping Center de Bayamón con dos (2) kilos de cocaína propiedad del *Drugs Enforcement Agency* (en adelante el D.E.A.) y unos rifles propiedad del Negociado de Investigacions Especiales (en adelante el N.I.E.). Una vez allí debía llamar a Meliá para pedirle ayuda para transportar el material al Norte Shopping Center en Santurce. Candelaria acudió al lugar junto a varios agentes del N.I.E., el D.E.A., el *Federal Business Bureau* (en adelante el F.B.I.) y la Policía, y desde un teléfono público del centro comercial llamó a Meliá. Luego de varios intentos, logró comunicarse con éste al teléfono celular de su auto. Luego de identificarse con su nombre de encubierto, dijo que estaba en el Victory Shopping Center, indicó que estaba perdido y que necesitaba ayuda para llegar al Norte Shopping Center. Le manifestó a Meliá que tenía dos (2) paquetes. Ante esto, narró que Meliá le preguntó "pero ¿paquetes de que [sic]?". Candelaria le dijo que eran unos paquetes de prendas y diamantes 98% puros. Ante todo esto Meliá le indicó que no lo podía ayudar y que tenía que ir al Cuartel de la Policía más cercano para que lo orientaran. Le indicó que llamaría al cuartel para que enviaran una patrulla al lugar donde se encontraba. Estando en el Victory Shopping Center llegó una patrulla al lugar. Sin embargo, al preguntarle al conductor si lo había enviado Meliá, éste dijo que no. Esta ocasión de 30 de octubre fue la última vez en que Candelaria habló o vio a Meliá previo al día de su arresto.

y Meliá León. También corroboró la reunión efectuada en el restaurante El Fogón, en Vega Baja. Declaró que en esta ocasión vio sobre la mesa un reloj. E.N.P., pág. 45. De igual forma, corroboró que transportó a Meliá León al restaurante Los Hornos de Lajas en donde, una vez más, se reunió con Figueroa Ramos y Jaime Torres. Indicó que Figueroa Ramos entraba y salía continuamente del restaurante a usar un teléfono fuera de allí. Al poco rato llegó Candelaria.

Declaró, además, que en esa ocasión, al salir del restaurante "vio a Meliá y al muchacho [Candelaria] parado al lado de un carro azul [en] la parte de atrás del carro". E.N.P., pág. 45. Luego de esta reunión no volvió a reunirse con Candelaria o los coacusados.

La prueba de la defensa, por su parte, consistió de los testimonios de varios oficiales de la Policía que estaban a cargo de las Divisiones de Tránsito y de Patrullas de Carreteras de Puerto Rico. Todos ellos testificaron que en ningún momento recibieron instrucción u orden alguna de parte de Meliá León para que protegieran o no intervinieran con un vehículo o alguna persona. Señalaron, además, que tenían instrucciones específicas de intervenir con todo aquel que violara la ley, sin distinción de personas.[5]

Sometido el caso, el tribunal de instancia emitió un fallo de culpabilidad por los delitos imputados y condenó a Meliá León a pena de reclusión de forma concurrente por el término de diez (10) años en cada uno de los cargos de soborno agravado y quince (15) años por la infracción a la Ley Contra el Crimen Organizado. Inconforme con esta determinación y en conformidad con la Ley de la Judicatura de Puerto Rico vigente entonces, Meliá León acudió ante el Tribunal de Apelaciones, Sección Sur. Finalmente, el recurso fue referido ante nuestra consideración como conse-

---

[5] Otros testimonios de oficiales de la Policía fueron estipulados por las partes en cuanto a igual contenido y en términos de que Meliá aprobó prontamente todas las solicitudes de bloqueos vehiculares que se le hicieron y nunca canceló un bloqueo autorizado.

cuencia de la reestructuración del Sistema Judicial efectuada en 1993. Véase la Ley Núm. 11 de 2 de junio de 1993 (4 L.P.R.A. secs. 1, 2n, 35, 37-1, 61a, 121, 231 y 301).

En su escrito de apelación, Meliá León plantea la comisión de trece (13) errores. Los primeros dos (2) errores requieren determinar si se violentó su derecho constitucional, de que habrá de ser juzgado por un jurado imparcial. El tercer error cuestiona la admisión en evidencia de ciertas declaraciones de los coacusados Ernesto Figueroa y Jaime Torres, que fueron traídas al procedimiento por el testigo de cargo Edgar Candelaria Soto. El cuarto error cuestiona la determinación de culpabilidad por los delitos de soborno agravado. Los errores quinto y sexto se refieren a si existía una empresa criminal en los términos requeridos por la Ley Contra el Crimen Organizado. Los restantes errores se dirigen a cuestionar la apreciación de la prueba hecha por el juzgador y a cuestionar la exclusión como evidencia de cierta prueba sometida por la defensa.([6]) El Pro-

---

([6]) Los errores planteados por el apelante son los siguientes:

"PRIMER ERROR

"Erró al denegar una solicitud de posposición de juicio ... fundamentada ... en una campaña de descrédito público contra el Apelante ....

"Esta denegatoria ... privó al Apelante de su derecho a un juicio justo ante un jurado viéndose precisado a renunciar al mismo ....

"SEGUNDO ERROR

"Erró al no acceder a la solicitud del Apelante de juicio por separado de los otros imputados que hubiera garantizado la exclusión de manifestaciones ... inadmisibles contra el Apelante no siendo las mismas subsanables con instrucciones al jurado.

"Esta denegatoria ... fue fundamental para la renuncia que se vio precisada a hacer el Apelante de su derecho a juicio por jurado.

"TERCER ERROR

"Erró al [a]dmitir manifestaciones de otros imputados que eran claramente inadmisibles violando los criterios legales que permiten expresiones de alegados co-conspiradores [sic] en determinadas ocasiones.

"CUARTO ERROR

"Erró al concluir que el Apelante cometió tres delitos de soborno a pesar de que no se probaron los elementós que configuran este tipo de delito.

"QUINTO ERROR

"Erró al concluir que una supuesta 'empresa criminal' que comenzó a ser investigada por las autoridades en enero o febrero de 1991, y otra supuesta 'empresa criminal' que comenzó sus actividades en septiembre de 1991, constituían una y la misma alegada 'empresa criminal'. Ello sirvió de base para admitir prueba entera y totalmente impertinente e inmaterial.

curador General ha presentado un extenso informe. Luego de evaluar los escritos de las partes, estamos en posición de resolver.

## II

Como primer error imputado al tribunal de instancia, Meliá León plantea que fue violado su derecho a ser juzgado por un Jurado debido a que existía una campaña publicitaria de descrédito en su contra que impedía en ese momento la constitución de un Jurado imparcial. En específico, fundamenta esta alegación en que el 30 de septiembre y los primeros días de octubre de 1992 el Canal 11 de

---

"SEXTO ERROR

"Erró al no concluir que las actuaciones delictivas que comenzaron en septiembre de 1991, de entenderse que era [sic] actividades de una 'empresa criminal', ésta fue creada por el propio Estado por conducto del agente encubierto.

"SÉPTIMO ERROR

"Erró al emitir una Resolución escrita que no representa el verdadero balance justiciero de la prueba desfilada ....

"OCTAVO ERROR

"Erró al concluir que el testimonio del agente encubierto fue corroborado por otra prueba cuando la realidad es que tal prueba de corroboración se refirió a hechos que no estaban en controversia e ignoró la ausencia ... de prueba de corroboración sobre los aspectos fundamentales que sí constituían controversia.

"NOVENO ERROR

"Erró al enfatizar en su Resolución que el agente encubierto declaró pausadamente, etc., pretendiendo justificar con ello la credibilidad que dice le mereció dicho testigo ....

"DÉCIMO ERROR

"Erró al no admitir en evidencia una carta del Fiscal Federal al jefe de los Fiscales de Puerto Rico y el resultado de un examen de polígrafo a que fue sometido el co-imputado [sic], Sr. Ernesto Figueroa, por el Servicio Secreto de los Estados Unidos, cuyo resultado demostró la inocencia del Apelante.

"UNDÉCIMO ERROR

"Erró al no aplicarle a la prueba del Pueblo la norma legal de mirar la misma con cautela ante las innumerables ocasiones en que el Estado presentó prueba inferior habiendo tenido la oportunidad de presentar una superior.

"DUODÉCIMO ERROR

"Erró al concluir como cierto que el 27 de octubre de 1991, el agente encubierto 'habló clara y directamente' con el Apelante 'sobre la transportación de un material delictivo' y de 'haberle entregado dos mil dólares' al Apelante.

"DECIMOTERCER ERROR

"Erró al restarle la importancia debida al testimonio incontrovertido de todos los comandantes, capitanes y teniente primeros y segundos de la Policía de Puerto Rico, a cargo de todos los Cuarteles de Tránsito y de Patrullas de Carreteras de Puerto Rico ...." Escrito de apelación, págs. 1–4.

televisión transmitió una serie titulada "El Coronel Meliá al Desnudo",(⁷) la que a su juicio creó "una atmósfera de pasión y prejuicio contra ... el apelante". Memorando del apelante, pág. 7. Añade que la denegatoria del tribunal a posponer su juicio lo llevó a tomar la decisión de renunciar al juicio por jurado.(⁸) No nos persuade.

▪ Nos encontramos ante un procedimiento judicial seguido contra un alto funcionario de la Policía de Puerto Rico, por lo que resulta casi inevitable que en nuestra sociedad democrática los medios de comunicación masiva —y la ciudadanía en general— le brinden particular atención a las etapas del proceso. Ciertamente, "la publicidad excesiva que llega al jurado puede ser de naturaleza tal que prive al acusado a su derecho a[un] juicio justo e imparcial". (Escolio omitido.) E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1993, Vol. III, Cap. 30, Sec. 30.12, pág. 403. Por ello, la publicidad adversa que se despliega con antelación al juicio tiene particular relevancia para el tribunal, dada la posibilidad de que menoscabe derechos del acusado. *Pueblo*

---

(⁷) Según surge de su escrito, el título de la serie era alegórico a una fotografía en poder del Ministerio Público en la que aparecía el imputado exponiendo sus genitales mientras estaba acompañado de otras dos (2) personas. Dicha fotografía fue presentada como parte de la serie de televisión que transmitió el Canal 11. Ésta, sin embargo, nunca fue admitida en evidencia.

(⁸) En su escrito, el apelante transcribe parte del contenido de la serie de televisión. Al respecto, incluye las expresiones siguientes:

" 'En los pasillos del Cuartel General era un secreto a voces, los supuestos contactos de Meliá con elementos del bajo mundo'.

" 'Un día antes de su arresto, su compadre y amigo de años, Jaime Torres, rendía Declaración Jurada involucrándolo con una red de narcotraficantes que operaban desde el área Oeste.

" 'Se informó que cuentan con más de cincuenta horas de grabación, el testimonio de Jaime Torres, varias fotografías que colocan a Meliá en escenas donde se realizaron transacciones y el testimonio de dos choferes de la uniformada que lo llevaron a las reuniones con el agente encubierto. Igualmente cuentan con un grupo de fotos que se encontraron en las oficinas del ex-coronel [sic], donde se muestra a éste en una orgía, en un penthouse de Isla Verde. *Las Noticias tuvo acceso a una de éstas* donde se muestra a Meliá León vestido con guerrera con sus genitales expuestos en compañía de una mujer y un comerciante del Condado, que ya fueron interrogados.' " (Énfasis en al original.) Memorando del apelante, págs. 2–3

*v. Rivera Nazario*, 141 D.P.R. 865 (1996). Sin embargo, la existencia de publicidad por parte de los medios de comunicación no justifica por sí sola la posposición de un juicio o la disolución de un Jurado. Como hemos afirmado en el pasado, "[e]l hecho de un caso recibir mayor publicidad no establece por sí solo la comisión de un error en el juicio ni crea automáticamente prejuicio en contra del acusado". *Pueblo v. Chaar Cacho*, 109 D.P.R. 316, 326 (1980).

Hemos examinado detenidamente los autos de este caso y de ellos surge que el foro de instancia tenía plena conciencia de la necesidad de tomar medidas cautelares para evitar que la publicidad generada por el proceso judicial perjudicara los derechos de Meliá León. Al respecto, la Minuta de 5 de octubre de 1992 es reveladora. El magistrado de instancia detalló en ella las medidas tomadas para garantizar un proceso de selección de jurado lo más depurado posible. Expresa, en parte, lo siguiente:

La primera norma que se establece es que se seleccionarán los primeros 20 jurados individualmente y se llevará a cabo por el tribunal un "voir dire" sobre el aspecto de la publicidad y qué efectos les ha ocasionado a éstos. Se hará el "voir dire" más extenso. Advirtiéndole a los abogados que en caso de la menor duda, ante el menor titubeo del panel, se eliminará del mismo [a] cualquier persona que pueda haber formado juicio sobre los hechos del caso en virtud de la publicación que ha habido. Minuta de 5 de octubre de 1992, pág. 3.

Ese mismo día el tribunal de instancia inició el proceso de *voir dire*. En la sesión de la tarde, los coacusados Ernesto Figueroa Ramos y Evelyn Figueroa Rodríguez renunciaron a su derecho a juicio por jurado e hicieron alegación de culpabilidad. Mientras, el proceso continuó contra los coacusados Overt Elena Orengo, Jaime Torres Vargas y Meliá León. Al día siguiente, las partes hicieron el proceso de *voir dire* al grupo de veinte (20) jurados.

Un examen de la minuta de la vista de 7 de octubre es igualmente reveladora. Al respecto, señala:

El Tribunal hace constar que se ha[n] examinado hasta ahora

dos paneles de jurados, uno sorteado el día 5 de octubre de 1992 y otro sorteado el día 6 de octubre de 1992.

En el día de hoy se ha[n] sorteado 20 jurados que comparecerán mañana. ... *La norma que ha seguido el Tribunal es excusar* [a] *toda persona que haya visto los reportajes del Canal 11 y* [a] *toda aquella persona que por alguna razón informó tener juicio formado previo al caso* y todas las personas por razones de salud o de onerosidad por razón de trabajo. (Énfasis suplido.) Minuta de 7 de octubre de 1992, pág. 2

Al siguiente día, Meliá León renunció a su juicio por jurado.([9]) Como puede apreciarse, las medidas tomadas por el juez de instancia son claramente congruentes con nuestros pronunciamientos previos. *Pueblo v. Rivera Nazario*, supra; *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991); *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990). De hecho, la preocupación del apelante en términos del perjuicio que pudo haber ocasionado la transmisión de la serie televisiva del Canal 11 fue atendida por el foro a quo al establecer como norma que cualquier persona que hubiera visto el programa o tuviera juicio formado sería excusado del proceso. De este modo, la alegación del apelante sobre la imposibilidad de constituir un Jurado imparcial es, ante estos hechos, altamente especulativa. El primer error no fue cometido.

## III

El segundo error planteado por Meliá León cuestiona la denegatoria del foro de instancia a tramitar los procesos judiciales seguidos contra los coacusados de forma separada del seguido en su contra. Señala que tal denegatoria

---

([9]) Véase la Minuta de 8 de octubre de 1992, pág. 1. El procedimiento de selección del Jurado continuó en cuanto a los coacusados Overt Elena Orengo y Jaime Torres Vargas. Posteriormente se desestimó la acusación en cuanto a Overt Elena Orengo y Jaime Torres hizo alegación de culpabilidad.

lo obligó a renunciar al juicio por jurado debido a que la celebración de los procedimientos de forma conjunta hubiera permitido que el Jurado escuchara declaraciones, aunque admisibles contra otros coacusados, inadmisibles contra Meliá León, situación que a su juicio no podía ser subsanada mediante instrucciones al Jurado. Por ello, afirma que "no tenía otra alternativa que renunciar a su derecho a un juicio por jurado, como hubiera deseado [ser juzgado]". Memorando del apelante, pág. 2.

■ Como es sabido, la Regla 89 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, permite la consolidación de juicios contra distintos acusados cuando se les imputa la comisión de delitos surgidos del mismo evento criminal. Reglas 37 y 89 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Si tal consolidación acarrea un perjuicio potencial para alguno de los coacusados o para "El Pueblo", nuestro ordenamiento jurídico aconseja la celebración de los procesos por separado. Véase la Regla 90 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.([10]) De ordinario, la persona que solicite la separación de procedimientos deberá demostrar el perjuicio que representa la acumulación de acusados. Véase Chiesa, *op. cit.*, Cap. 25, Sec. 25.3, pág. 199.

Las Reglas de Procedimiento Criminal también disponen para la celebración de juicios por separado ante la oportuna solicitud de un coacusado

> ... cuando se acusare a varias personas y una de ellas hubiere hecho declaraciones, admisiones o confesiones pertinentes al caso que afectaren adversamente a dicho coacusado, a menos que el fiscal anunciare que no ofrecerá tales declaraciones, admisiones o confesiones como prueba y que tampoco hará en

---

([10]) La Regla 90 de Procedimiento Criminal dispone:

"Si se demostrare que un acusado o El Pueblo han de perjudicarse por haberse unido varios delitos o acusados en una acusación o denuncia, o por la celebración del juicio conjuntamente, el tribunal podrá ordenar el juicio por separado de delitos o de acusados, o conceder cualquier otro remedio que en justicia proceda." 34 L.P.R.A. Ap. II.

forma alguna, referencia a las mismas durante el juicio. 34 L.P.R.A. Ap. II, R. 91.

■ Esta regla, vista en conjunto con la Regla 92 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, referente a personas acusadas por el delito de conspiración y a las declaraciones efectuadas por éstos luego de finalizada, tiene el efecto práctico de establecer una separación compulsoria de procedimientos judiciales contra coacusados cuando uno de éstos

> ... hubiera hecho declaraciones incriminatorias que afectan al acusado que solicita la separación, salvo que:
> 1. El Fiscal se comprometa a no ofrecer tales declaraciones incriminatorias como prueba ni hacer referencia alguna a ellas durante el juicio; o
> 2. se imputa que el delito de conspiración y las declaraciones incriminatorias del coacusado fueron hechas durante la vigencia de la alegada conspiración. Chiesa, *op. cit.,* Sec. 25.3, pág. 206.

■ Esta separación compulsoria de procedimientos contra coacusados está fundada en el dilema que representa la existencia de declaraciones, admisiones o confesiones de un coacusado que, aunque son admisibles contra éste, *son inadmisibles contra otro coacusado.* Sin embargo, en las instancias en que las declaraciones, admisiones o confesiones son perfectamente admisibles contra ambos coacusados, tal peligro desaparece y, por lo tanto, las consideraciones de índole constitucional y de política pública que ordenan la separación de los procedimientos no están presentes, ya que, aún realizando los procedimientos por separado, éstas serían admisibles contra todos. Véase *Pueblo v. Echevarría Rodríguez II,* 128 D.P.R. 752, 759 (1991), en el cual afirmamos que " '[s]i la declaración o admisión de uno es independiente y directamente admisible contra el otro, no hay necesidad de separar los juicios, y no se viola el derecho a confrontación' ". De este modo, la resolución de la controversia señalada requiere analizar si las declaraciones admisibles contra los coacusados eran in-

admisibles contra el apelante. Ese es precisamente el señalamiento del tercer error, por lo que en este punto es oportuno dirigir nuestra atención hacia éste.

## IV

En su escrito de apelación, Meliá León cuestiona la admisión como prueba substantiva, a pesar de su oportuna objeción, de ciertas declaraciones de Ernesto Figueroa y Jaime Torres por voz del testigo de cargo Edgar Candelaria Soto. Entre estas declaraciones señala las expresiones de Figueroa Ramos de 5 de septiembre de 1991, en términos de que éste tenía los contactos necesarios porque "conocía a un sargento de la Policía de Puerto Rico que es compadre del Coronel Enrique Meliá, que es persona con mucho poder y que ambos bregan". E.N.P., pág. 19. Igual planteamiento hace en cuanto a lo expresado por Figueroa Ramos y Jaime Torres al agente Candelaria con respecto a que Meliá León había manifestado que participaría en la transportación de armas y explosivos por las carreteras del país. Aduce que se trata de prueba de referencia inadmisible, pues no satisface los requisitos prescritos por la Regla 62(E) de Evidencia, 32 L.P.R.A. Ap. IV, ya que el Ministerio Público no aportó prueba independiente que demostrara la existencia de una conspiración entre los declarantes y el acusado. Examinemos sus planteamientos.

A. La Regla 62(E) de Evidencia, *supra*, permite, como excepción a la regla de exclusión de prueba de referencia, la admisión en evidencia de una declaración ofrecida contra una parte si tal declaración "[e]s hecha por un coconspirador de dicha parte durante el curso de la conspiración y en la consecución del objetivo de ésta". 32 L.P.R.A. Ap. IV.

En *Pueblo v. Miranda Santiago*, 130 D.P.R. 507, 515 (1992), señalamos que "para cumplir con el concepto de coconspirador requerido por la Regla 62(E) de Evidencia, *supra*, basta que se trate de una declaración hecha por una

persona que actuaba en común acuerdo en la realización de un acto ilegal con la parte contra quien se ofrece". Con ese fin, el juez de instancia debe recibir *prueba independiente* que tienda a demostrar: (1) la existencia de la conspiración entre el declarante y la persona contra la cual se ofrece la declaración como prueba; (2) que la declaración fue hecha durante la vigencia de la conspiración, y (3) que la declaración fue hecha en la consecución de los fines de la conspiración. *Pueblo v. Echevarría Rodríguez I*, supra; *Pueblo v. Castro*, 75 D.P.R. 672 (1953). Véanse, además: E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1979, Vol. I; R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 1ra ed., Santo Domingo, Ed. Corripio, 1994, págs. 389–397. Véase, de la jurisdicción federal, *McCormick on Evidence* Sec. 267, págs. 792–794 (3ra ed. 1984).

■ No es preciso demostrar la existencia de una conspiración en los términos requeridos por un estatuto penal. Por ello, el *quantum* de prueba requerido para establecer su existencia es menor que el requerido para demostrar la culpabilidad de una persona por el delito de conspiración tipificado en el Código Penal. Véase *Pueblo v. Lebrón López*, 96 D.P.R. 274 (1968). Además, la determinación de la concurrencia de los requisitos antes esbozados, aún en juicios por jurado, es una tarea que le compete realizar al juez que preside el caso en conformidad con la Regla 9 de Evidencia, 32 L.P.R.A. Ap. IV. Véase Chiesa, *Práctica Procesal Puertorriqueña: Evidencia, op. cit.*, pág. 71.

Un examen de la exposición narrativa de la prueba advierte que el Ministerio Público presentó prueba adicional a las declaraciones impugnadas por la defensa. De hecho, el propio agente Candelaria prestó un testimonio sobre sus actividades personales con Meliá León.[11] En este sentido, testificó sobre el contenido de las conversaciones que en no

---

[11] De igual forma, otros testigos de cargo prestaron testimonio sobre los resultados de las investigaciones del *Task Force*.

menos de cuatro (4) ocasiones sostuvo con éste, en las cuales estaban presentes los declarantes de las expresiones impugnadas, el policía Jaime Torres y Ernesto Figueroa. Esta evidencia era admisible bajo nuestro ordenamiento jurídico, ya que versa sobre lo que el testigo de cargo escuchó y vio. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988). La controversia, entonces, queda circunscrita a determinar si esta prueba independiente debió ser presentada antes de la admisión de las declaraciones de los coacusados Torres y Figueroa Ramos y si con su presentación el Estado satisfizo las exigencias de la Regla 62(E) de Evidencia, *supra.*

■ En cuanto al primer aspecto es preciso advertir que las Reglas de Evidencia nada disponen. En otras jurisdicciones, al evaluar similar controversia, se ha establecido que el tribunal puede admitir *condicionalmente* la declaración objeto de impugnación, sujeto a que en algún momento del proceso el Ministerio Público presente la evidencia independiente que requiere la regla evidenciaria. Esta posición ha sido sostenida bajo el fundamento de que se trata de un asunto de orden de prueba sobre el cual el juez tiene amplia discreción. Véanse: *U.S. v. Blanding*, 53 F.3d 773 (7mo Cir. 1995); *U.S. v. England*, 966 F.2d 403 (8vo Cir. 1992); *United States v. Williams*, 604 F.2d 1102, 1112–1113 (8vo Cir. 1979); *United States v. Ciampaglia*, 628 F.2d 632, 637 (1er Cir. 1980); *United States v. Fontanez*, 628 F.2d 687 (1er Cir. 1980).[12]

---

[12] En esta ocasión no estamos adjudicando si el foro de instancia podía tomar en consideración las propias declaraciones impugnadas como prueba de referencia inadmisible para determinar la existencia de la conspiración, según fue resuelto por el Tribunal Supremo federal en *Bourjaily v. United States*, 483 U.S. 171 (1987); Véanse: *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988); *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991), en el que no abordamos esta controversia en específico por no ser un asunto cuya consideración era requerida. En el caso de autos la prueba independiente fue presentada, aunque no antes de las declaraciones impugnadas. Véase, en particular, *Bourjaily v. United States*, supra, pag. 176 esc. 1. Véase, además, E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1989, Vol. I, pág. 71.

En el caso de autos, resulta significativo el hecho de que el juicio fue tramitado por tribunal de derecho. De este modo no estamos ante la situación en que una declaración erróneamente admitida puede constituir una influencia indebida para el Jurado. Como hemos afirmado, a diferencia de éste, los jueces son especialistas en Derecho, educados para sopesar aquella evidencia admisible y pertinente, o para admitirla sólo para unos fines y descartarla cuando el ordenamiento jurídico así lo exige. *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 826 (1983). Además, de la exposición narrativa surge que el Ministerio Público presentó su caso en un estricto orden cronológico. Este aspecto, sumado al hecho de que el proceso fue tramitado por tribunal de derecho, nos convence de que el tribunal sentenciador no abusó de su discreción al permitir la presentación de las declaraciones impugnadas aun cuando no haya habido una previa determinación de la concurrencia de los requisitos prescritos por la Regla 62(E) de Evidencia, *supra*. Se trata de una admisión condicionada a la oportuna presentación de la prueba independiente que acreditaría su admisibilidad. Aclarado lo anterior, procede examinar la prueba con la que contó el Ministerio Público de forma independiente a las expresiones de los coacusados para determinar si ésta satisface las exigencias de la referida Regla 62(E).

No hay duda de que Candelaria se reunió con Meliá León en no menos de cuatro (4) ocasiones. Al respecto declaró no sólo el agente Candelaria, sino también el entonces chofer de Meliá, el policía Rosa. En estas reuniones estaban presentes, entre otros, los coacusados Figueroa Ramos y Jaime Torres. Según revela la exposición narrativa de la prueba, la conversación entre éstos giraba en torno a supuestos "cargamentos" que necesitaban ser transportados por las carreteras del país. Surge del expediente, además, que Figueroa Ramos y Torres participaron directamente en la planificación y transportación de sustancias controladas y armas. Asimismo, del testimonio de

Candelaria sobre sus reuniones con los coacusados surgen instancias específicas en las que Figueroa Ramos y Torres le comentaban a Meliá León tales planes. Por ejemplo, en una de esas reuniones, Candelaria le expresó a Meliá que transportaba piezas "bien delicadas" y que "quería quedar bien con sus clientes". E.N.P., pág. 27. Surge que en ese momento Figueroa Ramos le dijo a Meliá que "tenían unos viajes pendientes y que necesitaban su ayuda y que Meliá le dijo que sí". Íd.

Resulta reveladora la reunión de 26 de octubre de 1991 en Vega Baja. En esa ocasión, Candelaria le habló a Meliá sobre unas "piezas" que debía transportar esa noche a un cliente de Bayamón y que se sentía preocupado porque ese día había visto muchas patrullas en las carreteras. Ante esto, Meliá le dijo que "bregara con Jaime que era bien querido en la Policía y que no iba a tener problemas". E.N.P., pág. 30. Fue entonces cuando Figueroa Ramos le dijo que "había hablado con papá, refiriéndose a Meliá, y que él estaba ahí con nosotros". Íd. Según expresa la exposición narrativa de la prueba, Meliá León afirmó entonces: "sí, sí, adelante, que el valiente es el que triunfa." Íd. Además, según Candelaria, en una de esas ocasiones Meliá le aconsejó que le pusiera corcho a sus camiones y le dijo que conocía a una persona que podía hacerlo.[13]

Por otro lado, Candelaria narró incidentes personales con Meliá León. Al respecto es significativo el ocurrido el 27 de octubre, cuando Candelaria narró que habló a solas con Meliá León y le dijo: "papá, usted sabe que yo voy a mover ese material esta noche." E.N.P., pág. 32. Además, señaló que ese día "le dijo que necesitaba que estuviera 'stand by' de doce de la noche a la una de la madrugada y que Meliá le respondió: 'no hay problema, tú tienes todos mis teléfonos' ". Íd.

---

[13] Según surge de la resolución del tribunal de instancia, el corcho es usado en los camiones para evitar la humedad en la cocaína cuando es transportada. Resolución de 6 de noviembre de 1992, pág. 8.

El *Task Force* brindó vigilancia corroborativa a todas estas reuniones mediante agentes, cuyo testimonio fue presentado en evidencia.

Estimamos que de las reuniones habidas entre los coacusados en las que estuvo presente el agente Candelaria y sobre las cuales declaró ampliamente, así como del contenido de sus conversaciones individuales con los coacusados, surge la prueba independiente requerida para demostrar la existencia de la empresa común en los términos de la Regla 62(E) de Evidencia, *supra*. Adviértase que el *quantum* de prueba requerido para llegar a esta determinación es menor que el requerido para probar la culpabilidad de una persona por el delito de conspiración.

Debemos, entonces, examinar si las declaraciones de los coacusados admitidas por el tribunal de instancia satisfacían los demás requisitos prescritos por la Regla 62(E) de Evidencia, *supra*; esto es, si fueron hechas durante la vigencia de la conspiración y si fueron hechas en la consecución de los fines de la conspiración.

B. Nuestra evaluación de la exposición narrativa de la prueba revela con claridad que la investigación realizada por el *Task Force* tuvo dos (2) etapas. En la primera de ellas, la investigación estaba centrada en una alegada empresa criminal que operaba en el área oeste del país en la cual, según la prueba presentada, Meliá León no estaba vinculado en modo alguno. Es en la segunda etapa, donde el Estado organiza una serie de actividades delictivas en las cuales participa el apelante. En este sentido, hay una etapa del proceso investigativo sobre la cual el Estado no ha aportado prueba de la existencia de una conspiración vigente entre Meliá León y los coacusados Figueroa Ramos y Jaime Torres, por lo que resulta forzoso concluir que las declaraciones hechas por dichos coacusados al testigo de cargo Candelaria Soto, en esa primera etapa, no son admisibles en evidencia como prueba de cargo contra Meliá León por no satisfacer el requisito que prescribe la Regla

62(E) de Evidencia, *supra*, de que las declaraciones cuya admisibilidad se solicita sean hechas durante la vigencia de la conspiración.

A la luz de lo anterior estimamos que las declaraciones de Figueroa Ramos y Jaime Torres de 5 y 14 de septiembre de 1991, respectivamente, que fueron efectuadas en lo que hemos caracterizado como la primera etapa de la investigación del *Task Force* —en términos de que conocían a un sargento de la Policía que podría dar protección en actividades delictivas, en alusión a Meliá León— son inadmisibles bajo la Regla 62(E) de Evidencia, *supra*.

Por otro lado, las declaraciones posteriores a esta fecha, las cuales fueron efectuadas luego del inicio de las reuniones entre las partes y sobre las cuales existe abundante evidencia, son admisibles bajo nuestro derecho probatorio. Al respecto, el Estado ha aportado prueba abundante de que al momento en que éstas fueron hechas, la conspiración estaba vigente y que, por tratarse de declaraciones relacionadas a la mejor forma de transportar material delictivo por las carreteras de la Isla, entre otros aspectos, fueron hechas en la consecución de los objetivos de dicha empresa común. De este modo, en relación con tales declaraciones quedaron satisfechos a plenitud los requisitos estatutarios que permiten la admisibilidad de las declaraciones de los coacusados Jaime Torres y Ernesto Figueroa Ramos como prueba substantiva contra Meliá León.

C. Resuelto lo anterior, retomemos el argumento planteado por el apelante en su segundo señalamiento de error en relación con que el tribunal de instancia erró al no separar el procedimiento judicial seguido en su contra del procedimiento judicial seguido contra los demás coacusados en virtud de la inadmisibilidad en su contra de ciertas declaraciones.

Según Meliá León, el daño causado por no haber separado los procedimientos judiciales consiste en que tuvo que

renunciar al derecho a juicio por jurado. Su argumentación no nos persuade.

Independientemente de la posibilidad de que tal planteamiento pueda constituir un elemento que en efecto lesione el derecho a juicio por jurado de un acusado, visto el trámite procesal del caso de autos, el planteamiento de Meliá León resulta inmeritorio. En primer lugar, ante la solicitud de la separación de los procedimientos, el Ministerio Público manifestó que no se proponía utilizar las declaraciones de los coacusados en el proceso judicial; por lo que, conforme a las Reglas de Procedimiento Criminal, la separación de los procesos no era compulsoria. Tal afirmación del Ministerio Público fue recogida por el tribunal de instancia mediante la resolución en la que denegó la solicitud de la defensa.

En segundo lugar, de la exposición narrativa de la prueba surge que la única declaración que posiblemente hubiese sido inadmisible contra Meliá León y admisible contra algún otro coacusado es la declaración de 14 de septiembre hecha por Jaime Torres al agente Candelaria, en términos de que para futuras operaciones "podía dar garantías con el Coronel Meliá", pues al momento de la renuncia de Meliá León a su derecho a juicio por jurado, los demás coacusados habían renunciado a éste. Ante estos hechos, concluimos que la denegatoria de la separación de los procedimientos judiciales no lesionó el derecho constitucional de Meliá León que habría de ser juzgado por un jurado imparcial.

Los errores segundo y tercero no fueron cometidos.

## V

Meliá León fue hallado culpable de tres (3) delitos de soborno en su modalidad agravada; esto es, solicitar o recibir dinero "por omitir o retardar un acto regular de sus funciones o por ejecutar un acto contrario al cumplimiento de sus deberes o con el entendido ... de que tal remuneración o beneficio habr[ía] de influir en cualquier acto contra-

rio al cumplimiento regular de sus deberes". Art. 210 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4361. Al respecto, las denuncias expresaban que Meliá León había aceptado, en calidad de soborno, "una pipa de fumar ... como regalo de una persona que se le presentó como traficante de drogas, a los fines de asesorarlo con relación a la mejor manera de transportar armas y drogas"; un reloj Rolex "valorado en más de $12,000.00, ... a cambio del asesoramiento que éste brindó sobre la mejor manera de mover el cargamento en las vías públicas", y "$2,000.00 en efectivo ... a cambio de su asesoramiento y disponibilidad en el movimiento del cargamento, ejecutando un acto contrario al cumplimiento regular de sus deberes como Teniente Coronel en la Policía de Puerto Rico y omitiendo un acto regular de sus deberes". Según la prueba de cargo, los obsequios fueron entregados a Meliá León por el agente Candelaria en las reuniones que éstos sostuvieron el 12, 26 y 27 de octubre de 1991.

En su escrito, Meliá León señala que el tribunal de instancia erró al hallarlo culpable de los delitos de soborno agravado, ya que distinto al Art. 209 del Código Penal, 33 L.P.R.A. sec. 4360, la conducta tipificada como soborno agravado en el Art. 210 del Código Penal, *supra*, requiere que el actor o la persona que incurra en éste haya realizado el acto punible directamente, por lo que para probar que el delito se configuró es preciso presentar evidencia de "actos afirmativos inequívocamente dirigidos a configurar la omisión penable [sic]" o "prueba... tendente a demostrar la ejecución del acto contrario al cumplimiento regular de sus deberes". Memorando del apelante, pág. 25. Añade que "[l]a mera aceptación de la dádiva o beneficio no consuma el delito, hace falta la conducta afirmativa o la omisión para que se configure el delito". Íd. En este sentido, nos sugiere que contrario al Art. 209 del Código Penal, *supra*, según el cual el delito de soborno queda configurado con la mera solicitud del privilegio, aun cuando la acción regular dentro de las funciones del cargo que genera el soborno no sea realizada, en el caso del Art. 210 del Código Penal,

*supra,* se requiere que la persona imputada omita la realización de aquello para lo cual fue sobornado o realice el acto contrario a la ley. No le asiste la razón.

■ El Art. 209 del Código Penal, *supra,* tipifica como delito la solicitud o el recibo de dinero o cualquier otro tipo de beneficio para *realizar un acto regular dentro de las funciones* de aquellos funcionarios que el artículo enumera. El Art. 210 del Código Penal, *supra,* en cambio, penaliza la solicitud o el recibo de dinero o cualquier otro beneficio: (1) por *omitir* la realización de un acto que ordinariamente está dentro de las funciones de tales funcionarios; (2) por ejecutar un acto *contrario a la ley,* o (3) según el entendimiento de que tal beneficio influirá en sus gestiones oficiales. Mientras el citado Art. 209 penaliza la conducta de funcionarios u otras personas de solicitar y recibir algún beneficio para realizar lo que —de ordinario— deben hacer como parte de sus funciones, en el referido Art. 210 se penaliza una conducta que el legislador entendió que era más reprochable. Se trata de dos (2) modalidades del delito de soborno, en los que la modalidad agravada no la constituye la ejecución del acto requerido al ser sobornado, sino que tan sólo el entendido de dejar de hacer lo que se le requiere en el empleo o hacer algo ilegal, conductas que el legislador concibió como más lesivas a la integridad gubernamental e institucional, y configuran el delito.

De forma cónsona con estos pronunciamientos, los comentaristas expresan que el Art. 210 del Código Penal, *supra,* tiene cuando menos tres (3) instancias en las cuales el delito de soborno agravado queda configurado. Estas son:

> Primero: *solicitar o recibir* el dinero o beneficio o *aceptar la promesa* por omitir o retardar un acto regular de sus funciones. ...
> Segundo: cuando el sujeto activo *ejecuta, acepta o solicita* dinero o un beneficio por llevar a cabo un acto contrario al cumplimiento regular de sus deberes.
> Tercero: cuando el sujeto activo, *recibe o acepta* el soborno bajo el compromiso o entendido de que tal remuneración o beneficio habrá de influir en cualquier acto, decisión, voto o dictamen

suyo en carácter oficial. (Énfasis suplido.) D. Nevares-Muñiz, *Código Penal de Puerto Rico comentado*, 3ra ed. rev., Hato Rey, Inst. Desarrollo del Derecho, 1995, pág. 341.

En su acepción general, el delito queda configurado tan pronto la persona o el funcionario público acepta la proposición que es objeto del soborno, o cuando solicita el beneficio por sí o por medio de una tercera persona a cambio de llevar a cabo un acto regular de su cargo o función. No es necesario que el acto que sea objeto del soborno se lleve a cabo. *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748 (1985). De igual forma, en su modalidad agravada no es requisito que la omisión requerida se concrete, ni que el acto contrario a la ley sea realizado. Por lo tanto, en el caso de autos no era necesario que el Estado presentara prueba de actos concretos contrarios a la ley ni de omisiones específicas, para que quedaran configurados los tres (3) delitos de soborno.

Examinada la prueba desfilada en instancia, tanto directa como circunstancial, somos de opinión que de ella pueden inferirse todos los elementos del delito de soborno en los tres (3) cargos imputados. Meliá León admite que aceptó de manos de Candelaria la pipa de fumar valorada en ciento setenta y cinco dólares ($175) y el reloj Rolex valorado en más de doce mil dólares ($12,000). Además, existe prueba adicional al testimonio de Candelaria que corrobora la versión de que éste habló a solas con Meliá y le entregó una bolsa de papel que, según el testimonio de cargo, contenía dos mil dólares ($2,000). En este extremo, el policía Juan Aponte Quiñones, quien brindó vigilancia corroborativa durante la investigación, declaró que vio cuando a las afueras del restaurante Los Hornos de Lajas "Candelaria sacó una bolsa de McDonald's de su carro, le mostró a Meliá lo que había adentro y se la entregó". E.N.P., pág. 49.

Por otro lado, del expediente surgen declaraciones incriminatorias admisibles contra Meliá León de acuerdo con la Regla 62(E) de Evidencia, *supra*, según antes discutimos, en términos de que Meliá estaba dispuesto a aceptar "un

regalito después de mover el cargamento". E.N.P., pág. 27. Asimismo, antes de la reunión habida el 26 de octubre en el restaurante El Fogón en Vega Baja, Figueroa Ramos le indicó a Candelaria que "Meliá necesitaba $5,000.00". E.N.P., pág. 29.

La participación de Meliá León en las distintas reuniones con Figueroa Ramos y Torres era contraria al cumplimiento de sus funciones o deberes como miembro de la Policía de Puerto Rico. Además, los asuntos discutidos en esas ocasiones según el testimonio de cargo, así como la estrecha relación que existía entre las personas investigadas, constituyen evidencia de que había un entendido de que los beneficios recibidos por Meliá León influirían en el descargo futuro de las funciones de su cargo.

A la luz de lo anterior y de toda la prueba presentada en instancia, es forzoso concluir que la determinación del foro de instancia, en cuanto a los cargos por soborno agravado, está sostenida por la prueba.

## VI

Los errores quinto y sexto planteados por Meliá León cuestionan diversos aspectos del fallo de culpabilidad por haber infringido el inciso (c) del Art. 3 de la Ley Contra el Crimen Organizado, *supra.* Previo a considerar sus señalamientos específicos, consideramos apropiado delimitar el alcance de dicho estatuto y precisar los contornos del delito por el cual Meliá León fue hallado culpable.

A. La Ley Contra el Crimen Organizado fue aprobada como respuesta a la creciente actividad de crimen organizado que había experimentado Puerto Rico en los últimos años. Una lectura de la exposición de motivos y del texto de la ley, según enmendado, revela un genuino interés de la Asamblea Legislativa en penalizar conducta constitutiva de lo que define como crimen organizado y de lavado de dinero, y en dotar a las agencias investigativas del Estado con nuevos mecanismos para su investi-

gación.[14] Esta ley ha generado poca jurisprudencia en Puerto Rico. Hasta ahora, tan sólo ha sido objeto de consideración por este Foro en una sola ocasión. Véase *Pueblo v. Santiago Feliciano*, 139 D.P.R. 861 (1995), en el cual consideramos la constitucionalidad de la disposición de la ley que autoriza la grabación de conversaciones orales no telefónicas durante la investigación del crimen organizado.

■ Es importante señalar, además, que el texto de nuestra ley es esencialmente similar al del *Racketeer Influenced and Corrupt Organization Act*, 18 U.S.C. sec. 1961 *et seq.*, comúnmente conocido por R.I.C.O. Este estatuto está inspirado en objetivos similares a los que originaron nuestra ley. Véase 31A Am. Jur.2d sec. 128 (1989). Ambos, además, contienen incisos similares en cuanto a las conductas o actividades prohibidas, por lo que la jurisprudencia interpretativa del texto federal nos provee un marco de referencia para ilustrar los contornos de nuestra ley, siempre que al hacerlo no se frustren los objetivos perseguidos por nuestra Asamblea Legislativa y no se viole algún derecho protegido por nuestra Constitución.[15]

En el caso de autos, la disposición por la cual fue hallado culpable Meliá León es el Art. 3(c) de la Ley Contra el Crimen Organizado, *supra*, preceptivo de que:

> (c) Será ilegal que una persona empleada por o asociada a cualquier empresa o negocio, participe, directa o indirecta-

---

[14] Al respecto, la Exposición de Motivos de la Ley Contra el Crimen Organizado expresa, en lo pertinente:

"El ámbito limitado del proceso para obtener evidencia admisible, material y suficiente, que sostenga un encausamiento de naturaleza penal nos presenta un escollo adicional en los recursos y remedios disponibles a las autoridades gubernamentales.

"Por ello, para proteger el bienestar y seguridad de los ciudadanos el propósito de esta ley es contrarrestar el crimen organizado mediante el establecimiento de nuevos remedios y mecanismos de naturaleza civil y penal." 1979 Leyes de Puerto Rico 490.

[15] Por tratarse de derecho puramente estatutario, no estamos obligados a interpretar nuestra Ley Contra el Crimen Organizado de la misma forma que el Tribunal Supremo de Estados Unidos interpreta el *Racketeer Influence and Corrupt Act* (la ley R.I.C.O.). De este modo, la referencia a jurisprudencia federal es sólo para fines ilustrativos.

mente, en la dirección de los asuntos de dicha empresa a través de un patrón de actividad de crimen organizado o mediante la recaudación de una deuda ilegal.

Las disposiciones contenidas en el Art. 3 de esta ley, *supra*, sin embargo, deben ser examinadas a la luz de las definiciones provistas en su Art. 1 (25 L.P.R.A. sec. 971a). Según este artículo, una empresa o negocio está constituida por

> ... cualquier sociedad, corporación, asociación u otra entidad legal, y cualquier unión o grupo o de individuos asociados, aunque no constituyan una entidad legal, exceptuando aquellos que se asocian primordialmente para fines sociales, familiares o políticos. 25 L.P.R.A. sec. 971a(f).

■ Como puede apreciarse, la definición de empresa o negocio contenida en la Ley Contra el Crimen Organizado es amplia. Incluye no sólo empresas o asociaciones constituidas con fines legales, sino también a asociaciones o grupos de personas organizadas al margen de la ley con el objetivo de realizar todo tipo de actividad delictiva.[16]

■ La jurisprudencia federal, que ha interpretado la definición análoga que contiene la ley R.I.C.O., dispone que una empresa o un negocio, según los términos de ese estatuto, posee los tres (3) elementos característicos siguientes: (1) un propósito común o compartido entre las personas asociadas; (2) una organización cuyos miembros funcionen como una unidad continua, es decir, debe existir algún grado de continuidad estructural y de individuos participantes, o aún una amenaza de continuidad futura, y (3)

---

[16] El equivalente federal (ley R.I.C.O.) dispone:

"(4) 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. sec. 1961(4).

El Tribunal Supremo de Estados Unidos resolvió expresamente que el término "empresa" contenido en la ley federal R.I.C.O. incluye tanto empresas con fines legales como con fines delictivos. *United States v. Turkette*, 452 U.S. 576 (1981). De este modo rectificó alguna jurisprudencia que había resuelto que dicha ley no penalizaba actividades de personas vinculadas a empresas cuyos fines eran exclusivamente ilegales. Véanse: *United States v. Sutton*, 605 F.2d 260 (6to Cir. 1979); *United States v. Anderson*, 626 F.2d 1358 (8vo Cir. 1980).

una existencia de una estructura diferenciada de los actos específicos que configuran el patrón de crimen organizado. *U.S. v. Kragness*, 830 F.2d 842 (8vo Cir. 1987); *Streck v. Peters*, 855 F. Supp. 1156 (D. Hawaii 1994); *Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 821 F. Supp. 232 (D. Del. 1992).

 El otro aspecto medular en una acusación al amparo del Art. 3 de la Ley Contra el Crimen Organizado, *supra*, lo es la determinación de que existe un patrón de crimen organizado. Sobre este aspecto, la ley establece que para que quede configurado un *patrón de actividad de crimen organizado* se "requiere por lo menos dos (2) actos de actividad de crimen organizado, realizados dentro de un período de diez (10) años, uno de los cuales deberá ocurrir con posterioridad a la fecha de vigencia de este inciso". 25 L.P.R.A. sec. 971a(i). Tales actos constitutivos de la *actividad de crimen organizado* según el artículo primero de la ley son:

> ... cualquier acto o amenaza relacionado a asesinato, secuestro, juegos ilegales, leyes relativas a la prostitución, incendio, apropiación ilegal, robo, obscenidad, soborno, extorsión o la venta, posesión y transportación de sustancias controladas o armas, sujeto a acusación criminal bajo las leyes del Estado Libre Asociado o las leyes de los Estados Unidos de América. 25 L.P.R.A. sec. 971a(b).

Para establecer la existencia de un patrón de crimen organizado, la jurisprudencia interpretativa de la disposición análoga del estatuto federal ha destacado que deben estar presentes dos (2) factores. En primer lugar, es necesario que exista una relación entre los actos de crimen organizado imputados. Dos (2) actos aislados no establecen por sí solo un patrón. Véase *Sedima S.P.R.L. v. Inrex Co.*, 473 U.S. 479 (1985). En este sentido se requiere que los dos (2) o más actos de crimen organizado señalados como constitutivos del *patrón* estén interrelacionados de alguna manera lógica. Véase *United States v. Starnes*, 644 F.2d 673 (7mo Cir.), *cert.* denegado, 454 U.S. 826 (1981). Para hacer esta determinación bajo el estatuto federal, algunos tribu-

nales han examinado los actos imputados en busca de un plan, motivo o esquema común, así como la existencia de propósitos, resultados, víctimas, participantes o métodos similares. Véanse: *Televideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9no Cir. 1987); *Rush v. Oppenheimer & Co., Inc.*, 628 F. Supp. 1188 (S.D. N.Y. 1985).

En segundo lugar, debe existir algún grado de continuidad. Con relación a este elemento de temporalidad es preciso examinar si los actos constitutivos del patrón de crimen organizado son efectuados por medio de una empresa criminal activa a lo largo del tiempo. Véase *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229 (1989). Es importante destacar que aunque ambos elementos son requisitos independientes, los tribunales han advertido que en ocasiones la prueba de su existencia puede estar entremezclada. Íd., pág. 239.

No hay duda de que esta disposición estatutaria busca erradicar el uso de empresas legítimamente constituidas en actividades ilegales, así como las asociaciones o los grupos de individuos que se dedican principalmente a actividades delictivas. Sin embargo, una lectura de las disposiciones anteriores revela que la actividad proscrita en el Art. 3(c) de la Ley Núm. 33, *supra*, no es la mera participación de un individuo en una organización dedicada a actividades delictivas. El referido inciso (c) prohíbe la participación de una persona en la dirección de asuntos de una empresa, *mediante actividades que constituyen un patrón de crimen organizado o cobro de una deuda ilegal.*

 A la luz de lo anterior, surge con claridad que para probar la culpabilidad de una persona por violar el Art. 3(c) de la Ley Contra el Crimen Organizado, *supra*, el Estado debe presentar prueba de varios elementos: *primero* la existencia de una empresa en los términos definidos por la ley; *segundo*, que la persona imputada era empleada o estaba asociada a la empresa; *tercero*, que participaba en la dirección de los asuntos de la empresa

directa o indirectamente, y *cuarto*, que la persona impu-tada participó en ella mediante un patrón de actividad de crimen organizado, lo que a su vez requiere al menos dos (2) actos de crimen organizado, según los define el estatuto. Sin embargo, cada caso debe ser examinado con cautela para determinar si el Estado ha probado todos los elementos del delito y si ha satisfecho el *quantum* de prueba requerido de probar la culpabilidad de un acusado más allá de duda razonable.

Con lo anterior en mente, examinemos los errores seña-lados por Meliá León.

B. De su determinación de culpabilidad por infracción a este artículo Meliá León cuestiona *específicamente* si la empresa criminal investigada desde enero de 1991 consti-tuía la misma empresa criminal investigada en septiembre de ese año, y si la empresa criminal debe ser considerada como tal a los fines de la Ley Contra el Crimen Organizado ya que, a su juicio, ésta fue creada por el Estado por con-ducto del agente encubierto Candelaria Soto.

Sobre el primer aspecto, Meliá León aduce que de los hechos que tuvo el foro de instancia ante sí surgía que se trataba de dos (2) empresas criminales totalmente inde-pendientes, una investigada por las autoridades en enero o febrero de 1991, y otra en septiembre de 1991. Por ello, señala que considerar ambas empresas como una sola "sir-vió de base para admitir prueba entera y totalmente im-pertinente e inmaterial" al proceso seguido en su contra. No le asiste la razón.

No hay duda de que en enero y febrero de 1991 el *Task Force* estaba investigando una organización criminal que operaba en el área oeste del país que se dedicaba al tra-siego de armas y narcóticos, y que en esa ocasión la inves-tigación estaba centrada sobre Ernesto Figueroa Ramos y otras personas. De la exposición narrativa de la prueba no surge vinculación alguna de Meliá León con los hechos de-lictivos investigados en ese momento.

En septiembre y octubre del mismo año se continuó investigando a Figueroa Ramos, entre otros. En esta ocasión, además, la investigación incluyó al ex coronel Meliá León. Asumiendo, para propósitos del argumento, que en efecto se trataba de dos (2) empresas independientes según los términos del estatuto, la controversia, entonces, consiste en determinar si al no existir vinculación alguna de Meliá León con los hechos investigados en enero y febrero de 1991, la referencia durante el juicio a hechos investigados entonces afectó el proceso contra el apelante, y si se le imputaron hechos delictivos cometidos en esa fecha.

Una lectura de la denuncia contra Meliá León y los demás coacusados nos advierte que todos los actos constitutivos del patrón de crimen organizado imputados contra Meliá León fueron cometidos entre el 12 y el 27 de octubre de 1991. En la denuncia no se menciona ningún acto realizado en los meses en que se inició la investigación del *Task Force*.

De igual modo, no hemos hallado referencia a declaraciones o expresiones hechas durante el inicio de la investigación que tengan el efecto de perjudicar a Meliá León en el juicio en su contra. Una lectura de la exposición narrativa de la prueba revela que la referencia a sucesos investigados por parte de los testigos de cargo anteriores a esta fecha responde al interés del Ministerio Público de colocar en contexto la investigación realizada por el *Task Force*. De este modo, las alegaciones de Meliá León, en el sentido de que la presentación del testimonio relacionado a la investigación efectuada en enero y febrero de 1991 lo perjudicó, no encuentran apoyo en los autos del caso, pues aun asumiendo que se trataba de dos (2) empresas independientes según los términos de la Ley Contra el Crimen Organizado, la referencia a tales hechos en nada afectó al apelante.

Por otro lado, siguiendo el argumento del apelante de que la Policía investigó empresas distintas, de la prueba presentada podía inferirse que Meliá León participó en la organización criminal investigada en septiembre y octubre

de 1991. De la exposición narrativa de la prueba surgen no menos de cuatro (4) reuniones entre las personas investigadas y Meliá León en las cuales estuvo presente el agente encubierto Candelaria Soto. Las personas investigadas mantenían comunicación con Meliá León, y de la prueba presentada se desprende con claridad que existía una estrecha relación de confianza entre ellos. De hecho, de las declaraciones de los coacusados, admitidas como prueba substantiva, se desprende que el apelante Meliá León tenía conocimiento de gestiones de tráfico de armas y drogas por las vías públicas de Puerto Rico.

De la exposición narrativa de la prueba surge con claridad que Meliá León participó en la dirección de los asuntos de la empresa investigada. Entre las partes hubo múltiples reuniones que claramente revelan que estaban planificando actividades de crimen organizado. Desde la primera reunión de Candelaria con Meliá León, éste proveyó información muy valiosa con respecto a los planes de vigilancia de la Comandancia de la Policía de la División de Tránsito. En este sentido, dijo que "los bloqueos empezaban en noviembre y que todos los papeles debían estar al día". E.N.P., pág. 24. Además, le señaló que con lo que la Policía tenía problemas "era con los furgones". E.N.P., pág. 43. Conscientes de los planes de vigilancia de la Policía, la organización trazó su operación delictiva y las horas en que se efectuaría.

Además, en la reunión del 12 de octubre, Candelaria le expresó su preocupación con los registros que la Policía realizaba, ya que "transportaba piezas delicadas y quería quedar bien con sus clientes". E.N.P., pág. 27. En esa ocasión Figueroa Ramos le dijo a Meliá "que tenían unos viajes pendientes y que necesitaban su ayuda". Íd. A todo esto, según el testimonio de Candelaria, Meliá respondió que "sí", en alusión a que los ayudaría.

En otra ocasión, Candelaria le expresó a Meliá que tenía "unas piezas que un cliente de Bayamón quería que se las entregara esa noche". E.N.P., pág. 30. Meliá preguntó: "¿piezas de, piezas de?." Fue cuando Candelaria le dijo que

había visto muchos "cowboys" en las carreteras, refiriéndose a patrulleros, y que "tenía miedo [de] que la policía le diera un tumbe". E.N.P., pág. 30. Indicó Candelaria que Meliá le dijo que "bregara con Jaime que era bien querido en la Policía y que no iba a tener problemas". Íd.

Por otro lado, del testimonio del policía Rosa, chofer de Meliá León, surge evidencia que demuestra la existencia de una relación de confianza entre éste y los demás coacusados miembros de la empresa. Al respecto, señaló que Figueroa Ramos "llamaba bastante [a Meliá] y ya le conocía la voz". E.N.P., pág. 45.

Todos estos factores permiten razonablemente inferir, como lo hizo el tribunal sentenciador, que el apelante era parte de la empresa investigada. En este extremo coincidimos con el Procurador General cuando afirma que la "aportación [de Meliá León] a la actividad ilegal consistía en ofrecer asesoramiento en cuanto al momento más indicado para la transportación de la mercancía". Alegato del Procurador General, pág. 45.

Este error no fue cometido.

C. En cuanto al segundo aspecto antes indicado y que Meliá Léon identifica como el sexto señalamiento de error, el apelante nos señala que el foro de instancia erró al no determinar que las actuaciones delictivas realizadas en septiembre de 1991, de ser consideradas como actos de una empresa criminal, fueron promovidas por el propio Estado a través del agente encubierto, en cuyo caso la empresa debe ser concebida como una criatura estatal.

■■■ No negamos que aun bajo las disposiciones de la Ley Contra el Crimen Organizado pueda plantearse la defensa de entrampamiento. Sin embargo, como antes afirmamos, la Ley Contra el Crimen Organizado no penaliza la pertenencia a una empresa, sino la participación en ésta mediante un patrón de crimen organizado. Aun cuando la empresa hubiera sido creada por el Estado, si en efecto la persona imputada cometió dos (2) o más actos de los que constituyen un patrón de crimen organizado como parte de

su vinculación a dicha empresa, se incurre en la conducta que la ley pretende castigar en el citado Art. 3(c).[17] Por lo tanto, debemos dirigir nuestra atención hacia este aspecto de la ley; esto es, si se satisface el requisitos de que Meliá León participó en la empresa a través de un patrón de crimen organizado.

D. Según el texto de la Ley Contra el Crimen Organizado, los presupuestos básicos o los actos constitutivos del patrón de crimen organizado son dos (2) o más actos o amenazas relacionados a lo delitos de: (1) asesinato, (2) secuestro, (3) juegos ilegales, (4) leyes relativas a la prostitución, (5) incendio, (6) apropiación ilegal, (7) robo, (8) obscenidad, (9) soborno, (10) extorsión y (11) venta, posesión y transportación de sustancias controladas o armas. El lenguaje usado por el legislador claramente expresa que será considerada como actividad de crimen organizado cualquier *acto o amenaza* de los anteriores delitos.

En el caso de autos, Meliá León fue hallado culpable de tres (3) delitos de soborno agravado, delitos que la ley concibe como actos que pueden ser constitutivos de un patrón de crimen organizado. Sin embargo, el apelante expresa en su escrito de apelación que, aún asumiendo que la prueba de cargo demostrara su culpabilidad por los tres (3) cargos de soborno agravado, estos actos no pueden ser considerados como los presupuestos constitutivos del patrón de crimen organizado debido a que el único acto criminal para beneficio de la empresa, que podría habérsele imputado,

---

(17) Un aspecto interesante de la interpretación dada por los tribunales a la ley federal es que aun entidades gubernamentales quedan comprendidas dentro de la definición de empresa para propósitos del estatuto federal. De hecho, existe jurisprudencia que ha reconocido que la Policía, como entidad gubernamental, puede constituir la empresa o el negocio según los términos de la ley, lo que revela que el énfasis dado por lo tribunales no es al origen de la empresa, sino a su existencia y a la participación en ésta mediante un patrón de crimen organizado. Véanse: *U.S. v. Garfinkle*, 842 F. Supp. 1284 (D. Nev. 1993); *U.S. v. Ruiz*, 905 F.2d 499 (1er Cir. 1990); *U.S. v. Mokol*, 957 F.2d 1410 (7mo Cir. 1992). Véanse, además: *U.S. v. Roth*, 860 F.2d 1382 (7mo Cir. 1988), en que las partes habían estipulado que un tribunal de apelaciones está comprendido dentro de la definición de empresa a los fines de la ley federal R.I.C.O.; *United States v. Bright*, 630 F.2d 804 (5to Cir. 1980), en el cual se determinó que la Oficina del Alguacil constituía la empresa a los fines del estatuto federal.

era la transportación del cargamento el 28 de octubre de 1991. De este modo plantea que "hubo tres actuaciones suyas (los tres sobornos) pero *un solo acto para la empresa*: el del 28 de octubre de 1991". (Énfasis en el original.) Memorando del apelante, pág. 41. No tiene razón.

■■■ En primer lugar, la ley tan sólo habla de actos o amenazas relacionados a los delitos de soborno. Desde el punto de vista de la conducta que la Ley Contra el Crimen Organizado pretende castigar, el criterio determinante no es si la persona imputada de participar en un patrón de crimen organizado ha sido quien ha ofrecido el soborno o quien lo ha recibido. Lo importante consiste en que los actos de soborno, en los que la persona ha incurrido, hayan sido producto de su vinculación con la empresa. Esta apreciación es cónsona con jurisprudencia en Estados Unidos que ha determinado la procedencia de la acusación por infracción a la ley R.I.C.O. contra personas que han incurrido en el delito de soborno. Véanse: *U.S. v. Mokol*, 957 F.2d 1410 (7mo Cir. 1992); *U.S. v. Stodola*, 953 F.2d 266 (7mo Cir.), *cert.* denegado, 506 U.S. 834 (1992); *U.S. v. Kotvas*, 941 F.2d 1141 (11mo Cir. 1991); *Alcorn County, Miss. v. U.S. Interstate Supplies*, 731 F.2d 1160 (5to Cir. 1984); *United States v. Forsythe*, 560 F.2d 1127 (3er Cir. 1977).

En segundo lugar, una lectura del texto de la ley revela que lo importante no es que quien se beneficie sea la empresa, sino que la persona imputada participe en los asuntos de la empresa a través de un patrón de crimen organizado. Igual conclusión ha sido sostenida por diversos tribunales en Estados Unidos con relación a la ley R.I.C.O. *United States v. Scotto*, 641 F.2d 47 (2do Cir. 1980);[18] *United States v. Field*, 432 F. Supp. 55 (S.D. N.Y. 1977); *United*

---

(18) Sobre este aspecto, en *United States v. Scotto*, 641 F.2d 47, 54 (2do Cir. 1980), se afirmó:

"We think that one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise."

*States v. Stofsky*, 409 F. Supp. 609 (S.D. N.Y. 1973), *cert.* denegado, 429 U.S. 819 (1976).

No albergamos duda de que los delitos de soborno fueron cometidos por Meliá León por conducto de su vinculación con la empresa investigada. Así, una vez determinada la culpabilidad de Meliá León por los delitos de soborno, su vinculación con la empresa investigada y que los delitos de soborno fueron producidos como parte de su vinculación a dicha empresa, resulta forzoso concluir que no erró el foro de instancia en su determinación de culpabilidad por infracción al Art. 3(c) de la Ley Contra el Crimen Organizado, *supra*. Los tres (3) delitos de soborno eran suficientes para establecer el patrón de crimen organizado según lo requiere la ley. Los errores quinto y sexto no fueron cometidos.

## VII

Los errores restantes se dirigen a cuestionar la apreciación de la prueba efectuada por el magistrado de instancia y la exclusión como evidencia de cierta prueba sometida por la defensa. Examinemos cada una de estas alegaciones.

Meliá León cuestiona la exclusión como evidencia de una carta del Fiscal federal en Puerto Rico, Daniel López Romo, dirigida al jefe de los fiscales de la jurisdicción de Puerto Rico, Pedro G. Goyco Amador, y el resultado de una prueba de polígrafo al que fue sometido el coacusado Ernesto Figueroa por el Servicio Secreto de Estados Unidos, que estaba incluido como anejo de la carta. Aduce que no pretende que se acepte en evidencia la prueba de polígrafo y su resultado, sino las respuestas dadas por Ernesto Figueroa a los agentes investigadores, según el fundamento de que éstas constituyen prueba que permite impugnar la credibilidad de Figueroa Ramos. A su juicio, sus respuestas constituyen manifestaciones exculpatorias contenidas en un documento oficial preparado por las autoridades federales, por lo que son admisibles según la Regla 65(H) de Evidencia, 32 L.P.R.A. Ap. IV, la cual regula la admisión en

evidencia de prueba de referencia a través de documentos y expedientes oficiales del negocio. Al respecto señala que el "fallo condenatorio ... tomó en consideración expresiones de un coimputado por voz de un tercero (el agente Candelaria) e ignoró las que eran exculpatorias, hechas por la misma persona a agentes que investigaban el mismo àsunto en la jurisdicción federal". Memorando de la parte apelante, pág. 65.

■ Una lectura de la Regla 65(H) de Evidencia, *supra*, advierte la inaplicabilidad de esta disposición a lo pretendido por el apelante. Dicha regla permite la admisión en evidencia de un expediente o informe oficial cuando éste se ofrece para probar: (1) un acto, una condición o un evento, (2) la inocurrencia de tal acto o evento, o (3) la inexistencia de la condición, si el curso del negocio era hacer expedientes de dichos actos, condiciones o eventos. Se trata de una regla que permite la admisión en evidencia de ciertos documentos oficiales preparados en el curso normal de un negocio que, por su naturaleza, ostentan cierto grado de confiabilidad como prueba de la ocurrencia o inocurrencia de hechos o sucesos.

El apelante no pretende que se admita en evidencia la prueba de polígrafo como prueba de la ocurrencia de un hecho, como lo sería en este caso el propio hecho de la realización de la prueba. En cambio, pretende que se acepten las respuestas ò declaraciones dadas en esa ocasión por Figueroa Ramos ante un funcionario federal como prueba exculpatoria. Para este objetivo no se puede valer de la Regla 65(H) de Evidencia, *supra*.[19]

---

[19] A pesar de su contención, resulta claro que se trata más bien de una declaración anterior de Figueroa Ramos cuya admisibilidad se solicita como prueba de impugnación, la cual sólo podría ser admisible si satisface los requisitos de la Regla 63 de Evidencia, 32 L.P.R.A. Ap. IV, que regula la admisibilidad de declaraciones anteriores de testigos, sujeto a que el declarante esté presente en el juicio o vista en el que se solicita la admisión, o según la Regla 64 de Evidencia, *supra*, que condiciona la admisión de declaraciones anteriores sujeto a la no disponibilidad del declarante. Analizadas estas disposiciones a la luz de lo pretendido por Meliá León, surge claramente su inaplicabilidad, pues Figueroa Ramos no estaba sujeto a ser

Como undécimo error, el apelante señala que el tribunal debió mirar con cautela la prueba del Ministerio Público, ya que presentó prueba inferior teniendo a su disposición prueba superior. Véase la Regla 16(6) de Evidencia, 32 L.P.R.A. Ap. IV. El apelante, en lugar de identificar aquella prueba en poder del Ministerio Público que hubiese probado los cargos en su contra y no fue presentada, se limita a enumerar gestiones que pudo haber efectuado el *Task Force* para realizar la investigación y así obtener evidencia inculpatoria que, a su juicio, sería de rango superior a la presentada. La discusión de este error, además de ser altamente especulativa, podría llevar al absurdo de aceptar como defensa, en casos como el que nos ocupa, el hecho de que las autoridades dejaron de realizar determinada gestión investigativa para obtener evidencia en un proceso criminal. Ese no es el objetivo del principio evidenciario planteado por Meliá León.

Los errores restantes cuestionan la apreciación de la prueba efectuada por el juzgador de los hechos. Una lectura sosegada y desapasionada de la exposición narrativa de la prueba y de todos los documentos que constan en el expediente no revela indicio de pasión, prejuicio, parcialidad o error manifiesto por parte del juez de instancia. Por tal razón, no debemos alterar la forma en que dirimió la credibilidad de los testigos. *Pueblo v. Acabá Raíces*, 118 D.P.R. 369 (1987); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981).

## VIII

En resumen, la prueba presentada en el foro de instancia era suficiente en derecho para sostener la culpabilidad del acusado Enrique Meliá León por los delitos imputados más allá de duda razonable. Por tal razón, en ausencia de

---

contrainterrogado en el proceso criminal en instancia —véase *Pueblo v. Stevenson Colón*, 113 D.P.R. 634 (1982)— ni se nos ha demostrado su no disponibilidad.

fundamentos de derecho para ello, no nos corresponde alterar esa determinación.

*Se emitirá la sentencia correspondiente.*

El Juez Asociado Señor Negrón García no intervino.