LA SOCIEDAD DE GANANCIALES compuesta por JOSÉ ÁNGEL AMILL FÉLIX y su esposa EDMELINDA RIVERA, demandantes y recurridos, *v.* MIGUEL A. MELÉNDEZ BORRERO, BORINQUEN MUSIC CORPORATION y COMMERCIAL INSURANCE COMPANY, demandados y recurrentes.

*Número:* R-72-116      *Resuelto:* 29 de enero de 1973

*Vivas, Martínez-Texidor & Limeres,* abogados de los recurrentes; *Luis Carmona Bultrón* y *José A. Rivera Mercado,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Se recurre de la sentencia del Tribunal Superior, Sala de Bayamón, que condenó a los recurrentes a pagar $15,000 al recurrido José A. Amill Félix y $4,000 a su esposa Edmelinda Rivera por concepto de daños sufridos con motivo de una colisión de vehículos de motor.

Los recurrentes apuntan, en síntesis, que el tribunal de instancia incidió (1) en la apreciación de la prueba y (2) al condenar a los recurrentes a pagar $4,000 como compensación por los daños sufridos por la Sra. Rivera de Amill así como el pago de intereses y honorarios de abogado.

Concluimos que debemos revocar la sentencia dictada en este caso.

El tribunal de instancia concluyó que:

"(1) El día 26 de octubre de 1969 a eso de las 9:00 de la noche el demandante José A. Amill Félix manejaba una guagua 'pick up' en dirección de San Juan a Bayamón. Conducía por el segundo carril de la Carretera Número 2 contados éstos de Norte a Sur. Cuando iba por un sitio conocido por 'La Caridad', un truck que le precedía por el carril de su derecha entró al carril ocupado por el demandante. El señor Amill se desvió entonces hacia el carril central y mientras discurría por el mismo una guagua propiedad de la compañía demandada y manejada por Miguel A. Meléndez Borrero que viajaba en dirección contraria por el segundo carril contados de Sur a Norte por dicha carretera, abandonó dicho carril y entró también al carril central. El señor Amill, demandante en este caso vio este movimiento como a 40 pies al frente. Trató de desviar hacia su derecha para evitar un accidente con el automóvil que avanzaba de frente pero éste siempre lo impactó por su lado izquierdo.

(2) Para la fecha de este accidente la Carretera #2 en el mencionado tramo estaba divida en cinco carriles separados por líneas blancas. A la hora del accidente el tránsito por el carril central estaba prohibido en ambas direcciones, ya que la señal de tránsito en forma de 'X' que regula el tránsito por el mismo estaba roja hacia ambos lados del tránsito.

(3) Como resultado de dicho accidente el demandante sufrió fractura del tercio medio del húmero izquierdo, fractura conminuta de la base del segundo, tercero, cuarto y quinto metacarpiano de la mano izquierda, fractura de la segunda y tercera falange de la porción proximal de la mano izquierda y amputación transversa de la falange distal del quinto dedo de la mano izquierda. Fue recluido en el Hospital Universitario donde le hicieron un debridamiento de las heridas, sutura e inmovilización del brazo izquierdo mediante enyesamiento de dicho brazo (long-cast). Estuvo recluido en dicho hospital por espacio de ócho días y después fue tratado en la Clínica de Ortopedia como paciente externo hasta el día 23 de diciembre de 1969. En esta última fecha le removieron el yeso.

A la fecha de la vista de este caso el demandante tiene limitación para la rotación del antebrazo izquierdo, ligera limitación de rotación, elevación y anteversión de dicho brazo izquierdo. No tiene suficiente fuerza para agarrar con la mano izquierda y

además tiene una ligera elevación del dorso de la mano izquierda debido a fractura de los huesos de la mano.

(4) Para la fecha del accidente el demandante tenía unos 30 años de edad y era maestro de albañilería. Obtenía un ingreso semanal de unos $125.00 semanales [*sic*]. Como resultado de este accidente no ha podido volver a trabajar en dicho oficio. Sólo recibe un ingreso semanal de unos $25.00 que le paga su padre por ayudarlo y algunas colectas que hacen sus amigos y compañeros de trabajo.

. . . . . . . . .

(6) El señor Miguel A. Meléndez Borrero, empleado de la demandada fue negligente al abandonar súbitamente el carril por donde discurría y entrar al carril central de la carretera sin tomar precauciones para evitar chocar con el auto del demandante que discurría en dirección contraria por dicho carril.

El demandante fue negligente al manejar su automóvil por un carril por el cual estaba prohibido el tránsito a la hora de este accidente.

(7) Habiéndose establecido la concurrencia de faltas como la causa de los daños, el Tribunal concluye que la parte demandada fue responsable en un 75% del total de los daños sufridos por el demandante y que éste también fue negligente en un 25% de dichos daños. Artículo 1802 del Código Civil, supra; *Quintana Martínez* v. *Valentín,* [99 D.P.R. 255 (1970)]."

El testimonio directo del recurrido con respecto a como ocurrió el accidente, fue el siguiente:

"Cuando estaba llegando al Hectómetro 2, por ahí, venía en el carril del medio, entonces de momento un caro [*sic*] se me cruzó [*sic*] en el medio, entonces el carril del lado de allá, como estaba completamente desabitado [*sic*] que se podía usar en el momento . . .

HON. JUEZ:

¿Cuál otro, el que queda a su izquierda o a su derecha?

TESTIGO:

En ese momento, a la izquierda mía, pues entonces salí por un momento para no tener problemas con el auto que se había metido, me metí al carril del medio para volver a meterme al segundo carril.

LCDO. CARMONA:

¿Qué tiempo usted transitó por ese carril del medio?

R. Como minuto y medio; cuando de momento había caminado como un minuto, viene una guagua de frente que no estaba en ningún momento por allí y me invadió el carril mío y me destrosó [sic] mi brazo izquierdo.

HON. JUEZ:

¿Entonces apareció otro auto?

R. Sí, era una guagua.

P. ¿Por dónde apareció?

R. Venía de frente.

P. ¿De frente a usted?

R. No, ella venía, cuando yo me metí al carril estaba vacío, pero de momento no me dio tiempo ni oportunidad de nada, me dio en el lado izquierdo, llevándose el parabrisas y la mano mía.

HON. JUEZ:

¿Por donde?

R. En el lado izquierdo.

P. ¿Y qué fue lo que le llevó?

R. Bueno me undio [sic] el guardalodo izquierdo, el lado izquierdo, el cual en ese momento pues recibí ese golpe en ese brazo, verdad.

HON. JUEZ:

¿En cuál?

R. En el izquierdo.

LCDO. CARMONA:

¿Señor Amill quien entró, de las dos partes, quién fue el primero en entrar a ese carril?

R. Yo entré primero.

. . . . . . . .

LCDO. CARMONA:

¿El automóvil suyo sufrió algún daño?

R. Sí, sufrió el guardalodo izquierdo y toda esa parte a lo largo desde atrás hasta *alante*, sufrió daños en toda esa área." (Énfasis en el original.)

En contrainterrogatorio añadió que mientras conducía su vehículo por la carretera número dos hacia Bayamón, en las cercanías de los establecimientos de Marcelino Mercury, iba un *truck* delante de él por el carril Núm. 4 y que:

"P. [*sic*] . . . entonces más adelante parece que había un carro estacionado.

P. ¿Parece o lo había?

R. Bueno, estaba parado.

P. ¿En el número cinco?

R. Sí, estaba dañado o parado allí.

P. ¿En el medio?

R. Estaba alineado así.

P. ¿Fuera de la vía de rodaje?

R. No, dentro del carril.

P. ¿Como?

R. O sea, que ocupaba el carril, entonces el truck se vio obligado a meterse hacia el carril mío.

HON. JUEZ:

¿El truck tiró hacia la izquierda?

R. Sí, para el carril cuatro como dice usted.

LCDO. LIMERES:

¿Qué más?

R. Entonces, como yo venía en ese carril me metí al otro carril que no se usa, con el propósito de que tan pronto le pasara al truck volver hacia mi carril.

P. ¿Tan pronto pasara a quién?

R. Tan pronto pasara el truck que se me había metido a mi carril, volver a meterme en mi carril.

P. ¿Cómo usted sabe que ese truck iba a meterse en su carril?

R. Porque lo hizo.

P. ¿Hizo alguna señal el truck?

R. Sí, me hizo señales.

P. ¿Y el truck iba al frente suyo?

R. Sí.

P. ¿Entonces el truck cambió de carril?

R. Y ocupó el carril en que yo iba.

P. ¿Y usted hizo lo mismo?

R. No, yo reducí [*sic*] la velocidad.

P. ¿Usted se salió de su carril y ocupó el carril del centro?

R. Sí, señor.

.        .        .        .        .        .        .        .

P. ¿A qué velocidad iba usted por ahí?

R. Bueno, como de 25 a 30 millas.

P. ¿Y dónde ocurrió el impacto con el carro de la Borinquen

Music, el lugar de la carretera?

R. Bueno ocurrió, o sea, cuando yo ocupé el carril, caminé en él como un minuto o algo así.

P. ¿A 30 millas por hora?

R. Más o menos, ese carril estaba completamente limpio.

R. ... cuando yo ví que venía de frente el truck, traté de desviarme.

HON. JUEZ:

¿Hacia dónde, hacia la derecha o hacia la izquierda?

R. No, hacia la derecha y mi carro quedó atravesado ...

P. ¿Testigo, qué tan lejos estaba este señor, cuando usted lo ve por primera vez?

R. Como ... como a 50 pies.

P. ¿Cómo es esta carretera, curva o recta?

R. Recta.

P. ¿Y usted dice que venía con las luces prendidas?

R. El venía ...

P. ¿Prendidas o apagadas?

R. Prendidas.

P. ¿Y usted le dice al Tribunal que en una carretera recta usted lo ve a 50 pies?

R. Se ve más lejos, pero cuando se me tiró encima, invadiéndome el carril ...

LCDO. LIMERES:

Esa no es mi pregunta.

HON. JUEZ:

Deje que termine de contestar, compañero.

LCDO. LIMERES:

Es que no es responsivo.

HON. JUEZ:

¿Dónde es que empiesan [sic] los 50 pies?

R. Bueno, el carro se ve a lo largo, como la carretera no tiene curva, pero cuando yo lo vi venía como a 40 ó 50 pies y no pude defenderme, cuando me di cuenta ya él me había invadido a mi por aquí. (Señala el mapa en la pizarra.)

P. ¿Y entonces a 50 pies usted dice que este señor le invade el carril suyo?

R. Sí ,señor.

P. ¿En qué forma lo hizo?

R. O sea, cuando él llegó aquí me cortó, ya yo estaba aquí cuando él me cortó, yo traté de desviarme y ahí fue que él hizo un viraje así y con la parte ésta me le dio a la guagua mía.

P. ¿Entonces él trato de salirse del carril?

R. Sí, se metió el carril y salió de nuevo.

P. ¿Vamos a ver, había algún carro, algún vehículo a la derecha de este señor?"

Por el contrario el testigo Wilfredo Rodríguez quien manifestó no estar relacionado con ninguna de las partes, testificó que al ocurrir el accidente, él transitaba detrás del vehículo conducido por el recurrente Meléndez Borrero por el segundo carril de Bayamón a San Juan y que "cuando yo venía de frente a mí venía una guaguita, vi que de momento se desvió impactando a la guagua que iba al frente mío en el carril donde yo estaba."

P. ¿Testigo, de qué carril, o sea, usted dice que viene una guagua en qué dirección?

R. De San Juan a Bayamón.

P. ¿En qué carril viajaba esa guaga que venía de San Juan para Bayamón?

R. En el momento que yo pude apreciar, venía del segundo y cortó al tercero.

P. ¿Mirando el diagrama que está en la pizarra, tenga la bondad de con la tiza de decir de qué carril?

R. Por éste carril, por aquí.

HON. JUEZ:

Señala el segundo carril en dirección de San Juan a Bayamón.

TESTIGO:

De momento cortó hacia el tercero que es el carril del centro y viene a darle a la guaguita que venía al frente mío, aquí.

HON. JUEZ:

¿Entonces dice que invadió el segundo carril de la otra dirección?

R. Y al pasarle fue que le dio a la otra guagua que venía de frente.

Lcdo. Limeres:

¿Testigo, usted dice que le dio en el carril segundo, qué hizo la guagua que venía de San Juan para Bayamón luego de darle al vehículo que iba de Bayamón hacia San Juan?

R. Bueno, al darle a la guagua, siguió y fue a parar bastante atrás, a un garaje de la 'Gulf' que hay a la entrada de Villa España.

P. ¿Le pregunto si la persona que viajaba de San Juan a Bayamón se quedó estacionada en el sitio de los hechos?

R. ¿La que iba de San Juan a Bayamón?

P. Sí.

R. No, él paró bastante alante [*sic*].

P. ¿Mostrándole esta fotografía , podría usted decir qué es lo que le muestra esa fotografía?

R. Bueno, aquí yo veo el garaje 'Gulf' donde ella se paró.

. . . . . . . .

P. ¿Y antes del impacto, vio si el señor hizo algo? [el recurrente]

R. Bueno, en el momento que vio la guaguita, trató de esquivar el golpe.

P. ¿Cómo?

R. Al virar a la derecha.

P. ¿Viró a esquivar el golpe, tiró hacia la izquierda o hacia la derecha?

R. Hacia la derecha." .

El recurrente testificó que en la noche del accidente conducía un camión Chevrolet de Borinquen Music Corp. por la Carretera No. 2 hacia San Juan por el segundo carril cuando al pasar por Villa España

"[D]e frente se me acercó un vehículo ocupando el carril del centro y el carril que yo ocupaba, cruzó un poco de la línea y me tuve que desviar hacia la derecha, pero siempre lo impacté el espejo retrovisor.

. . . . . . . .

. R. Al momento de crusar [*sic*] que fue tan rápido que se me acercó y crusando [*sic*] el carril que estaba vació y que tenía una flecha, una 'X'.

R. Cuando vi que ocupó el carril, pues dí hacia la derecha, pero siempre impacté con el espejo retrovisor."

Edelmiro Rodríguez, quien acompañaba al recurrente Meléndez Borrero, en la noche del accidente por ser su ayudante, corroboró el anterior testimonio de W. Rodríguez. Testificó que:

"TESTIGO:

Nosotros viajábamos por el carril número 2.

LCDO. LIMERES:

¿Por qué carril viajaba el Sr. Amill?

R. Por el carril número 3.

P. ¿Qué pasó allí en el km. 9.2?

R. Pues él se salió del carril 3 y nos dio a nosotros.

P. ¿Qué fue lo que les hizo?

R. Pues, bueno que nos dio en el espejo de afuera.

P. ¿Y en ese momento, por dónde viajaban ustedes?

R. Por el carril 2."

De lo expuesto es evidente que los testimonios de Amill y Rodríguez son contradictorios. Sin embargo el de Rodríguez ha sido corroborado por un testigo ocular desinteresado. El testimonio de Amill no ha debido merecer crédito pues estuvo lleno de evasivas y contradicciones.

Como indica el recurrente:

". . . Declaró el señor Amill Félix que en el Km. 9 de la carretera #2 existen cinco carriles y al llegar al Km. 9.2, un carro se le cruzó en el medio obligándolo a ocupar el carril central . . . Por otro lado, declaró no conocer de los hectómetros en dicha carretera, ni de lugares con excepción de Marcelino Mercury, [a pesar de ser] una persona que ha residido en Bayamón y ha utilizado 'bastante' dicha carretera. También declaró que la razón por la cual él ocupó el carril central fue para pasarle a un camión que le precedía y había ocupado el carril por el cual él viajaba, sin embargo, nunca llegó a pasarle a este camión. En una ocasión testificó que no lo hizo porque el choque se lo impidió; . . . en otra ocasión porque no llegó a darle alcance al camión, ya que iba bastante adelante. . . ."

El anterior análisis de la prueba demuestra que la versión del recurrido de cómo ocurrió el accidente es inverosímil y físicamente imposible. *Román Montalvo* v. *Delgado Herrera,*

89 D.P.R. 428, 436, 437 (1963); *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 582 (1961); *Villaronga* v. *Tribunal de Distrito*, 74 D.P.R. 331, 345 (1953); *Biaggi* v. *Sucn. Esbrí*, 71 D.P.R. 450, 457 (1950).

Su testimonio sobre el daño a su vista que le ocasionó el accidente no le mereció crédito al tribunal de instancia. [1]

Aunque Amill testificó que al ocurrir el accidente su vehículo permaneció en el lugar de la colisión, la prueba demostró que lo condujo hasta un garaje de la "Gulf" a la entrada de Villa España. De ser cierto su testimonio con respecto a cómo ocurrió la colisión es difícil creer que el único daño al camión fuese la rotura del espejo de retrovisión y que el vehículo de Amill mostrase abolladuras por su costado izquierdo delantero. La evidencia más bien demuestra que el impacto consistió de un roce de ambos vehículos por el lado izquierdo. Si Amill desvió su vehículo hacia la derecha como testificó al notar que se le acercaba el camión de la recurrente por el mismo carril, no es posible que la plataforma de este último vehículo viniera en contacto con el guardalodo delantero del vehículo de Amill. En este caso, al desviarse ambos vehículos hacia sus respectivas derechas, el contacto entre ellos debió ocurrir entre sus partes posteriores.

Estaba prohibido transitar por el carril central al cual se movió Amill momentos antes del accidente. No obstante lo hizo, según su testimonio, para pasarle a un camión que se le cruzó delante en el cuarto carril, por donde él se dirigía. No hay en la prueba explicación ni razón alguna que justificara que Meléndez condujera su vehículo por ese carril. La deducción más lógica, nos parece, es que al desviarse Amill al carril central se pasó lo suficiente por un instante, al segundo carril por donde venía Meléndez y, aunque Amill se desvió enseguida

---

[1] "(8 La prueba practicada no convence al Tribunal de que la incapacidad que está sufriendo el demandante al tener dificultad para ver por su ojo izquierdo está conectada con este accidente."—Conclusiones de Hecho del Tribunal Inferior.

a su derecha, no pudo evitar el roce de la parte delantera izquierda de su vehículo con la parte delantera izquierda del camión de la recurrente conducido por Meléndez.

En vista de lo expuesto, *debe revocarse la sentencia dictada en este caso por el Tribunal Superior, Sala de Bayamón, en 29 de marzo de 1972, y desestimarse la demanda.*

Los Jueces Asociados, Señores Torres Rigual y Martín, concurren en el resultado.