# 2002 DTA 86

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE SAN JUAN
PANEL III**

EL PUEBLO DE PUERTO RICO
Apelado

v.

WILLIAM SOTO BENIQUEZ
Apelante

Núm. KLAN-2001-00129

San Juan, Puerto Rico, a 23 de abril de 2002

Panel integrado por su Presidente, Juez Ortiz Carrión
y los Jueces Segarra Olivero y Negroni Cintrón

Segarra Olivero, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Tribunal de Primera Instancia, Sala Superior de San Juan, dictó sentencia condenatoria contra el apelante, William Soto Beníquez, por el delito de Asesinato en Primer Grado y otros delitos relacionados con la infracción de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 411 *et. seq.* El apelante solicitó la celebración de un nuevo juicio basado en que, con posterioridad a la imposición de la sentencia, recibió una comunicación referente a que el testigo principal de cargo, Juan Antonio Rodríguez López, en lo sucesivo Rodríguez, había mentido bajo juramento en procedimientos criminales anteriores. El tribunal apelado ordenó la comparecencia de Rodríguez, quien admitió que había mentido en otro caso, pero insistió en la veracidad de su testimonio en el caso de epígrafe. El tribunal apelado creyó dicho testimonio y denegó la moción de nuevo juicio mediante resolución de 23 de enero de 2001.

El apelante presentó un escrito de apelación ante este Tribunal el 8 de febrero de 2001. No obstante, omitió incluir en el recurso copia de la moción de nuevo juicio y copia de la resolución del tribunal de instancia en la que se declaró sin lugar la misma. Por ser esenciales dichos documentos para establecer la jurisdicción del Tribunal, conforme a las disposiciones procesales aplicables al caso, ██ ordenamos al apelante que mostrara causa por la cual no debía desestimarse la apelación. Este, a su vez, nos convenció de que el término apelativo fue interrumpido efectivamente por la presentación de la moción de nuevo juicio ante el tribunal de origen. Por consiguiente, dimos curso a la apelación del título y, a la vez, ordenamos la elevación de los autos originales del caso.

En el recurso presentado, el apelante le imputa la comisión de cuatro errores al tribunal sentenciador:

*"1) Erró el Tribunal en la apreciación de la prueba;*

*2) Erró el Tribunal en no dar credibilidad a una prueba científica;*

*3) Erró el Tribunal en no encontrar duda razonable en el presente caso;*

*4) Erró el Tribunal en el dictamen de la conspiración."*

A continuación exponemos los hechos pertinentes a la controversia que nos ocupa.

## I

El 25 de noviembre de 1992, en horas de la madrugada, el señor Reynaldo Cancel Robles fue asesinado en el Residencial Vista Hermosa de Río Piedras. El apelante fue acusado y convicto por su participación en dicho crimen y por otros delitos e infracciones a la Ley de Armas de Puerto Rico, *supra*. Los pormenores de lo sucedido fueron narrados por Juan A. Rodríguez López, en adelante Rodríguez, testigo principal de la Fiscalía, quien

participó en los actos delictivos. De la exposición narrativa estipulada de la prueba, reproducimos a continuación el testimonio de Rodríguez:

*"Declaró que tenía un convenio de inmunidad parcial a tenor con el cual estaba cumpliendo una condena de 99 años que originalmente era de 259 años por un caso conocido como La Masacre de Quintana. Estaba cooperando en casos ante el Estado Libre Asociado y en la Corte Federal. Al momento de declarar en este juicio ya había testificado en alrededor de diez (10) asesinatos. Declaró que conocía al apelante, a quien señaló en corte abierta y a quien llamaba "William El Descamisao". Igualmente declaró conocer a Erica, Jumbo, Alexis el de Ramos Antonini, a Chino, a Potón, a Fontánez, a Félix Moña, a Alexito y a Quelly, así como al otro co-acusado Juan Santiago Vázquez C/P Juan Corazón.*

*Declaró que conocía al apelante, William El Descamisao, desde hacía varios años, ya que trabajó como tirador en el punto de droga del apelante. Comenzó a trabajar en ese punto cuando tenía 14 o 15 años. Primero vendía y luego comenzó a tirar tiros. El apelante era su jefe. Igualmente, declaró cómo conoció al co-acusado, Juan Corazón; que se lo presentó Pitosito desde 1991, ya que éste tenía otro punto de droga en Manuel A. Pérez.*

*Declaró que el día 24 de noviembre de 1992 un grupo de personas llegaron a un lugar conocido como el "Masivo Pub" donde se encontraba William Soto Beníquez y otras personas.*

*Que allí llegó "Quelly" con un grupo indicando que estaban hartos de lo sucedido en Vista Hermosa y que ese día habían matado al papá de "Potón". Declaró que a Potón lo conocía del punto de Vista Hermosa que perte-necía a "Quelly". El día 24 de noviembre, cuando Quelly se fue a quejar de la muerte del papá de Potón, según el testigo, esto quería decir que a Quelly lo querían sacar del punto de Vista Hermosa y que habían comenzado con matar al papá de Potón. Al testigo le bastaba con que le dijeran esto para saber que había que meterse a Vista Hermosa, ya que según la ley de la calle, si se meten con uno de los tuyos, hay que defenderse. Quelly dijo "que teníamos que meternos a Vista Hermosa". Estábamos presentes William (el apelante), el Gordo, Pitosito y yo.*

*"Masive Pub" era como una casa convertida en Bar-Discoteca y William era el dueño. Así las cosas, el testigo Rodríguez López narró que al otro día por la tarde, alrededor de siete a ocho de la noche, estaba en la placita de la barriada Israel fumándose unos cigarrillos de marihuana con otra persona y luego decidió irse para su casa. Que cuando llegó al área donde se encuentra su residencia en la barriada Bitumul, encontró a William "El Descamisao" y estaban además Chuito "El Gordo" y Félix Moña oliendo perico. William Soto Beníquez le dijo al testigo que los muchachos se habían ido para Vista Hermosa para vengar la muerte del papá de Potón y le dijo ahí hay un rifle y dos metralletas para que vayas con Félix Moña. Esta conversación fue como a las diez de la noche. El testigo arrancó con Félix Moña hacia Vista Hermosa. Félix Moña iba con el rifle y el testigo cogió las dos metralletas. Detrás de ellos venía William y Chuito "El Gordo" en otro carro, que era un BMW de William. El testigo viajaba en un Chevrolet brown. El testigo vio el carro de William detrás de él. Dijo que fuimos al caserío de Vista Hermosa y que llegamos todos, William, Félix, Chuito "El Gordo" y yo. Que cuando llegamos a Vista Hermosa, nos parqueamos Félix Moña y yo, y William se parqueó detrás de nosotros. Cuando se bajó, el testigo vió a Pitosito, a Alexis el de Ramos Antonini, a Potón, a Chino (que es hermano de Potón), a Erick, a Guelo Fontánez y a Quelly. El testigo le dijo a Quelly "vamos a meternos". Comenzamos a tirarnos por la parte de atrás de los edificios. El testigo señaló dónde estaba el carro de William en un diagrama que le mostraron.*

*Fueron hacia la parte de atrás del montesito. El testigo vio un montón de fogonazos. Era mucha gente tirando tiros. Quelly nos dice "todos no pueden haber ido corriendo, tiene que haber gente en los aparta-mentos" y fuimos para allá. Casi todos nosotros corrimos hacia allá y William, que no tenía armas, estaba corriendo con nosotros.*

*Nos metimos en un apartamento a buscar a Cano. Nos metimos Erika, Jumbo, Pitosito y yo. Erica tocó a la puerta y llamó un nombre que no reconozco. El testigo se quedó en las escaleras. Erica y Jumbo le dieron patadas a la puerta.*

*La persona brincó por el balcón, se tiró por encima de nosotros y lo acribillamos. Llegaron Chino, Potón, Alexis, Guelo, Jumbo, Josué, Pitosito, Alexito, Félix Moña y le entramos a tiros. Seguimos para otro apartamento y me encontré a Juan Corazón y a Tomás. Juan tenía un AR-15. El testigo declaró, a preguntas del Fiscal, que Williams estaba con nosotros en el grupito corriendo y se mantuvo allí y no se marchó hasta que acabó el tiroteo. Posteriormente, el testigo vio al apelante luego de que se fueron de Vista Hermosa. El testigo declaró que Pitosito tenía un M-16 que le decíamos María Conchita porque era automática, que Alexis el de Ramos Antonini usó la mini-14, que Chino, Potón, Josué, Fontanez, Félix Moña y Alexito tenían AR-15 y que William El Descamisao no tenía armas aunque estaba corriendo con ellos. Esas armas las había visto anteriormente porque siempre andaban armados. Las armas pertenecían a los cuatro grupos que se habían unido esa noche, o sea, el de Quelly, William, Pitosito y Juan. El testigo cuidaba alguna de esas armas que le pertenecían a William El Descamisao y declaró que él le respondía a William, exclusivamente en relación a esas armas. El testigo declaró además que se pasaba con Pitosito y que sabían cuales armas eran de él y que sabía de las de Potón y Quelly. El testigo describió la vestimenta de la víctima, así como la verja de alambre y el lugar donde estaba el cadáver. Dijo además que después que mataron a esa persona, ellos dispararon una ráfaga de tiros y que la policía nunca llegó."*

El testigo, además, identificó una serie de fotografías que muestran el lugar de los hechos y el sitio donde yacía el occiso Reynaldo Cancel Robles.

Por otra parte, surge del expediente que Rodríguez fue confrontado en el contrainterrogatorio con el hecho de que, entre la muerte del señor Angel Ramón González Benítez, el papá de Potón, y la de Reynaldo Cancel Robles, transcurrió un corto período de sólo varias horas y no más de un día, según había declarado. El testigo contestó que él nunca le suministró fechas a nadie y que estaba seguro de lo que había hecho, aunque no estaba seguro del día en que sucedió. Además, manifestó que se había fumado unos cuantos cigarrillos de marihuana y que no sabía ni el día en que vivía.

Las referidas inconsistencias en el testimonio del testigo principal de cargo constituyen el argumento medular del presente recurso. En primer lugar, el apelante señala la imposibilidad física del testimonio de Rodríguez, toda vez que no es posible que el apelante hubiese matado al señor Reynaldo Cancel un día después de la muerte de éste. Sostiene que el testigo Rodríguez se encontraba, según sus propias palabras, en casa de una amiga en Trujillo Alto y no en San Juan cuando ocurrieron los hechos. Además, el apelante cuestiona la veracidad de las declaraciones del testigo, ya que éste, por un lado, no se acordaba de la fecha exacta de los acontecimientos delictivos debido a que usaba mucha marihuana, mientras que, por el otro, no tenía dudas de las horas, fechas, nombres de los testigos, designación de las armas y su calibre e incluso quién las usaba. En vista de lo anterior, argumenta que existe en este caso la duda razonable que, como parte del debido proceso de ley y la presunción de inocencia, imposibilita una convicción. Para fortalecer su argumento, el apelante menciona la comunicación que le fue suministrada por el Departamento de Justicia a los efectos de que Rodríguez había mentido bajo juramento en otros casos criminales, tanto en la esfera federal como en la estatal. ∎

Aunque en su alegato el apelante señala la comisión de varios errores, esencialmente se circunscribe a discutir uno de ellos, el relativo a la duda razonable. El resto de los señalamientos los discute indirectamente, sin acudir a planteamientos específicos en torno a ninguno de ellos. Procedemos, por lo tanto, a considerar conjuntamente los errores señalados poniendo énfasis en el argumento central del apelante.

## II

Ciertamente, al amparo de la Sección 11 del Artículo II de la Constitución del Estado Libre Asociado, 1 L.P.

R.A. (1982), págs. 307-8, y la Regla 110 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110, se presume inocente al acusado, y en caso de existir duda razonable acerca de su culpabilidad se le absolverá. Este principio cardinal impone al Ministerio Publico la carga de probar la culpabilidad, del acusado más allá de duda razonable. *Pueblo v. González*, 138 D.P.R. 691 (1995). Sin embargo, ello no significa que a los fines de establecer la culpabilidad del acusado, el fiscal venga obligado a destruir toda duda especulativa o imaginaria y probar su caso con certeza matemática. Sólo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón. *Pueblo v. Rosario Reyes*, 138 D.P.R. 592 (1995); *Pueblo v. Bigio Santana*, 116 D.P.R. 748 (1985).

La exigencia de prueba más allá de duda razonable no sólo es consustancial con el principio de presunción de inocencia, sino que también es un elemento del debido procedimiento de ley. *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984).

El Tribunal Supremo de Puerto Rico ha establecido que, para que pueda obtenerse una convicción válida en derecho que derrote la presunción de inocencia, es indispensable que el Ministerio Público presente prueba respecto a cada uno de los elementos del delito. *Pueblo en interés de F.S.C.*, 128 D.P.R. 931, 941 (1991); *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 652 (1986). Esa evidencia tiene que ser suficiente en derecho para establecer no sólo los elementos del delito, sino la relación de éste con el acusado y tiene que probarse más allá de duda razonable. *Pueblo v. Ramos y Alvarez*, 122 D.P.R. 287 (1988); *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 760-61 (1985). Además, tiene que ser satisfactoria, es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Rodríguez Santana*, 146 D.P.R. 860 (1998); *Pueblo v. Rodríguez Román*, 128 D.P.R. 121, 131 (1991); *Pueblo v. Narváez Cruz*, 121 D.P.R. 429 (1988); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974). La insatisfacción de la conciencia del juzgador con esa prueba es lo que conocemos como duda razonable. *Pueblo v. Toro Rosas*, 89 D.P.R. 169, 175 (1963).

No obstante, por ser la apreciación de la prueba desfilada en un juicio una cuestión mixta de hecho y de derecho, la determinación de culpabilidad de un acusado más allá de duda razonable es revisable como cuestión de derecho. *Pueblo v. Rivero, Lugo y Almodóvar, supra*, a la pág. 472 (1988); *Pueblo v. Cabán Torres, supra*, pág. 653. Sobre el particular, el Tribunal Supremo ha expresado que: *"[n]o cumpliríamos con nuestro deber si estando plenamente convencidos de que la prueba en determinado caso no establece la culpabilidad más allá de duda razonable, permitiéramos que prevaleciera una sentencia condenatoria. Cuando ello ocurre no se trata de una intervención con la función del juez o del jurado en la apreciación de la prueba, sino de un error de derecho."* [Bastardillas en el original] *Pueblo v. Carrasquillo Carrasquillo,* 102 D.P.R. 545, 552 (1974), citando a *Pueblo v. Serrano Nieves*, 93 D.P.R. 56, 60 (1966).

Una atenta lectura a la exposición narrativa de la prueba -no empece las contradicciones de segunda monta en la prueba testifical-, produce en el ánimo del lector la ausencia de duda sobre la culpabilidad del apelante. Agréguese a lo dicho que el Tribunal de Primera Instancia tuvo la oportunidad de ver y escuchar a los testigos mientras declaraban y pudo apreciar, percibir y evaluar, mejor que nosotros, su conducta en la silla testifical. Es asunto trillado en nuestra jurisprudencia que a no ser que se demuestre que el tribunal sentenciador actuó movido por pasión, prejuicio o parcialidad o que la prueba es improbable e increíble, o se distanció de la realidad fáctica, no debemos interferir con el dictamen de instancia. Tampoco se nos ha demostrado que el fallo apelado no constituya el balance más racional y justiciero de la prueba. *Pueblo v. Acevedo Estrada*, ___ D.P.R. ___ (2000), **2000 J.T.S. 69.**

Es norma firmemente establecida por nuestro Tribunal Supremo que la evidencia directa que ofrezca un testigo que merezca entero crédito al juzgador, será prueba suficiente de cualquier hecho. Prueba suficiente es aquélla que produce certeza o convicción moral en un ánimo no prevenido. Regla 10(c) de Evidencia, 32 L.P.R.A. Ap. IV, R.10(c); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Rodríguez Román*, 128 D.P.R. 121

(1991); Cuevas Segarra, José A. *Práctica Procesal Puertorriqueña, Evidencia,* **Publicaciones J.T.S.**, San Juan, 1979, Análisis Editorial, pág: 21.

No rige en Puerto Rico, la regla que disponía que si un testigo hubiese faltado a la verdad en una parte de su declaración, las otras debían ponerse en duda, o sea, la máxima *falsus in uno, falsus in omnibus*. Esta máxima no autoriza rechazar toda la declaración de un testigo porque se haya contradicho o faltara a la verdad respecto de uno o más particulares. *Pueblo v. Pagán Ortiz*, 130 D.P.R. 470 (1992).

El principio rector es que la misión de los tribunales requiere armonizar y analizar en conjunto e integralmente toda la prueba, a los fines de arribar a una conclusión correcta y razonable del peso que ha de concedérsele en su totalidad. *Pueblo v. León Martínez*, 132 D.P.R. 746 (1993); *Pueblo v. Pintos Lugo*, 131 D.P.R. 1015 (1992); *Quintana Tirado v. Longoria*, 112 D.P.R. 276, 292 (1982). Inconsistencias sobre hechos no esenciales no obligan a descartar todo el testimonio. De hecho, el testimonio perfecto, de ordinario, en lugar de ser indicativo de veracidad, es altamente sospechoso, ya que, por lo general, es producto de fabricación. *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 656 (1986); *Pueblo v. Chévere Heredia*, 139 D.P.R. 1 (1995).

No es nuestra función, a nivel apelativo, pasar juicio sobre la credibilidad de los testimonios ofrecidos en el foro de instancia. No somos dados a sustituir el criterio del juzgador -ante quien declararon los testigos y quien tuvo la oportunidad de apreciar su comportamiento, evaluar la veracidad de sus testimonios y dirimir cualquier conflicto que surgiese-, por nuestro propio criterio. La apreciación de la prueba por el foro de instancia debe prevalecer, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Dávila Delgado*, 143 D.P.R. 157 (1997); *Pueblo v. Meliá León*, 143 D.P.R. 708 (1997).

Desde *Quevedo v. Sucesión Pino*, 15 DPR 686, (1909), el Tribunal Supremo señaló que: "*Es un principio bien establecido que la credibilidad de los testigos, así como el peso que ha de darse a la prueba de carácter oral, en los casos en que estuviera en conflicto y fuera contradictoria, son todas cuestiones de hecho que han de resolverse por los llamados a juzgar tales cuestiones, sea por el tribunal o el jurado, y no cuestiones de derecho que habrán de ser resueltas solamente por el tribunal. Es principio sencillo que el juez sentenciador tiene mejores oportunidades que un tribunal de apelación para apreciar la credibilidad de las declaraciones testificales.*"

En el mismo caso y haciendo referencia a un pronunciamiento de un jurisconsulto del estado de Missouri, se expresó así: "*La verdad no surge siempre valiente y desnuda, sino más bien modestamente, de un extracto impreso presentado a un tribunal de última instancia. Con frecuencia se esconde en apartados rincones y lugares, visibles solamente a los ojos de un juez que conoce originalmente el caso. A él no se le escapa la mirada furtiva, el rubor de una conciencia avergonzada, la duda, el tono sincero, el petulante o el despreciativo, la vehemencia, la calma, el bostezo, el suspiro, la ingenuidad o la astucia o sagacidad, el poco respeto a la solemnidad de un juramento, o la completa inteligencia de lo que ello significa, el continente y semblante que ocupa la silla destinada a los testigos. El rostro desvergonzado del falsario, la locuacidad del testigo aleccionado al recitar lo que se le enseñara, o la excesiva vehemencia de un testigo verídico, son circunstancias todas que sólo por él pueden ser fielmente apreciadas*".

En *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 947, haciendo referencia a lo expresado por el eminente procesalista Carnelutti, en su obra *Revista di Diritto processuale civile*, año 1929, nuestro Tribunal Supremo expresó: "*La verdad es que el testigo debe ser oído, y visto; interrogado y mirado*". Don Alfonso de Paula Pérez, en "*La prueba de los testigos en el proceso civil español*" (ed. Reus, Madrid, 1968, pág. 7) añade: "*y es que no sólo habla la voz viva. También hablan las expresiones mímicas, el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al juez de otras tantas circunstancias*

*que han de valer más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación."*

### III

Conforme a los principios anteriormente esbozados, y luego de examinar los escritos de las partes y el expediente original del caso de autos, incluyendo la exposición narrativa de la prueba estipulada, procede la confirmación de la sentencia dictada por el Tribunal de Primera Instancia.

El análisis integral de la prueba testifical que tuvo ante su consideración el Tribunal de Primera Instancia, no produce en nuestro ánimo una insatisfacción e intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia. *Pueblo v. Cabán Torres, supra,* a la pág. 648. Correspondía al apelante señalar y demostrar la base para ello. Sus señalamientos no nos han persuadido. Como tan certeramente señalara nuestro más Alto Foro en el citado caso de *Pueblo v. Cabán Torres, supra,* a la pág. 648: "*Lo contrario, esto es, la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia, significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción*".

Según antes expuesto, la revocación de la convicción que ahora solicita el apelante se funda en el testimonio contradictorio del único testigo ocular de los hechos. Entiende dicha parte que las declaraciones del testigo, que alegadamente lo ubican en dos sitios a la misma vez, demuestran que no participó en los asesinatos. Menciona, a su vez, la norma referente a que, aun cuando es el juzgador de primera instancia el único que tiene la oportunidad de evaluar los gestos, apariencia y conducta del declarante a los efectos de otorgar credibilidad a su testimonio, no es posible sostener una conclusión sobre la veracidad del declarante si a todas luces su testimonio resulta físicamente imposible o claramente inverosímil. Véase, Regla 44 de las de Evidencia, 32 L.P. R.A. Ap. IV, R. 44; *Sociedad Legal de Gananciales v. Meléndez Borrero*, 101 D.P.R. 103, 111-112 (1973).

En resumen, el fundamento de la apelación del título versa esencialmente sobre el asunto de la falta de credibilidad del testigo, la que, a juicio del apelante, establece la duda razonable que justifica la revocación de la sentencia.

Ya se ha establecido que no es necesario rechazar toda la declaración de un testigo porque éste se haya contradicho o faltado a la verdad respecto a uno o más particulares. *Pueblo v. De León Martínez,* 132 D.P.R. 746 (1992). Más aún, el efecto de contradicciones de un testigo, quien admite haber mentido en otro proceso en que se le dio inmunidad, es cuestión de credibilidad a ser dirimida por el juez que entendió en la causa, ya que éste está en mejor posición que el tribunal apelativo para adjudicar lo relativo a credibilidad. *Pueblo v. Falú Martínez,* 116 D.P.R. 828, (1996). Por lo tanto, es imprescindible armonizar toda la prueba y analizarla en conjunto a los fines de arribar al peso que ha de concedérsele a ésta en su totalidad.

Hemos identificado circunstancias que militan en contra de la solicitud del apelante para que intervengamos con la adjudicación de credibilidad que realizó el tribunal sentenciador en torno al testimonio del Sr. Rodríguez.

En primer lugar, las declaraciones del testigo de cargo fueron corroboradas, en parte, por el testimonio del hermano de la víctima, José Enrique Cancel Robles. Este manifestó, entre otras cosas, que el día de los hechos se disponía a dormir entre 10:00 p.m. y 12:00 a.m. cuando escuchó, junto a su madre y hermano, varios disparos; que se metió en el cuarto cuando una persona llamó a su hermano en alta voz; que hubo una ráfaga de tiros contra la cerradura de la puerta y que salió para preguntarle a su hermano acerca de lo que estaba ocurriendo; que Reynaldo trató de sujetar la cerradura, pero se cortó y corrió y se lanzó desde el segundo piso por la puerta de atrás; que escuchó varias ráfagas de disparos entre 11:00 p.m. y 1:00 a.m.; y que volvió a ver a su hermano esa misma mañana tirado en la parte derecha de la misma esquina del edificio.

Lo anteriormente expuesto coincide con las declaraciones del testigo, Rodríguez, en ciertos aspectos

importantes. Según declaró este último, fue alrededor de las 10:00 p.m. que sostuvo la conversación con el acusado, justo antes de dirigirse ambos al residencial Vista Hermosa, y que una vez allí, comenzó el tiroteo. Esto es compatible con lo afirmado por el hermano del occiso referente a que escuchó las primeras detonaciones entre 10:00 p.m. y 12:00 a.m. desde el apartamento en que se encontraba dentro del referido residencial.

También coinciden las declaraciones en cuanto a lo ocurrido cuando fueron a buscar a la víctima a su apartamento. Rodríguez manifestó que fue con otras personas a buscar a Cano, nombre por el cual aparentemente conocía al occiso, y que escuchó cuando una de las personas que lo acompañaban *"llamó un nombre que no reconozco"*. Declaró, además, que sus acompañantes le dieron patadas a la puerta y que *"la persona brincó por el balcón, se tiró por encima de nosotros y lo acribillamos"*. Por su parte, José Cancel Robles expresó que alguien llamó a su hermano, el occiso, en voz alta; que, seguidamente, comenzó una ráfaga de tiros contra la puerta de entrada; y que su hermano corrió hasta la puerta posterior del apartamento y, finalmente, se tiró desde el segundo piso. Afirmó, además, que escuchó ráfagas de tiros entre 11:00 p.m. y 1:00 a.m. y que esa misma mañana vio a su hermano tirado en la misma esquina derecha del edificio.

De lo anterior, se desprende la concordancia de las declaraciones en cuanto a tiempo y lugar. Tanto las expresiones relacionadas con el momento específico de la ocurrencia como aquellas referentes a la situación conducente al salto realizado por Reynaldo Cancel Robles para escapar de sus perseguidores tienden a demostrar que el testigo, ahora impugnado, colaboró y percibió directamente los sucesos.

Por otra parte, el lugar en que fue encontrado el cuerpo del occiso, en la parte posterior del edificio número 40 del residencial Vista Hermosa, evidencia la veracidad de las declaraciones de Rodríguez con respecto a la inmediatez de su muerte desde que realizó el brinco para intentar escapar, o sea, desde la última vez que fue visto con vida por su hermano.

De otro lado, el señor Aníbal González Rodríguez, especialista en armas de fuego del Instituto de Ciencias Forenses y cuya capacidad fue estipulada por las partes, expresó que recibió 35 casquillos de bala, 31 casquillos de calibre 2.23 y 4 de calibre 9mm. Explicó que las balas calibre 2.23 son compatibles con el arma AR-15 y con otras armas compatibles, como la Mini-14, las cuales se cargan con magacín. También, reveló que pudo llegar a la determinación de que se utilizó un total de seis armas de fuego. Dichas conclusiones concuerdan con el hecho de que el cuerpo de la víctima presentara 39 perforaciones de entrada ■ y con las declaraciones antes expuestas del testigo Rodríguez en cuanto a que varias armas fueron utilizadas en el asesinato. Además, la gran mayoría de los casquillos encontrados son compatibles con los tipos de armas sobre las cuales declaró el testigo Rodríguez.

Más aún, el Informe de Análisis de Escena refleja que el suceso fue informado a los agentes investigadores a las 7:45 a.m. Esto concuerda con lo expresado por el testigo de cargo quien sostuvo *"que después que mataron a esa persona, ellos dispararon una ráfaga de tiros y que la policía nunca llegó"*. Según la exposición narrativa estipulada de la prueba, Rodríguez, además, describió la vestimenta de la víctima, así como la verja de alambre y el lugar donde se encontraba el cadáver.

No existe base para concluir que el testimonio de Rodríguez que vincula al apelante con los hechos delictivos, es inverosímil. La contradicción en que incurrió el testigo Rodríguez en torno a la fecha en que ocurrieron los hechos parece ser, más bien, producto de un desliz mental o una falta de reflexión. Cuando enfrentamos dicha contradicción a los detalles ofrecidos por el testigo Rodríguez en el resto de su testimonio, la veracidad de lo narrado y su credibilidad se fortalece. Téngase en cuenta, también, que existe prueba independiente que corrobora la versión del testigo Rodríguez; su percepción errónea en cuanto a la fecha de los sucesos resulta inconsecuente. Debemos recordar que el hecho de que un testigo incurra en contradicciones en torno a detalles de los hechos no es óbice para que se le de crédito a su testimonio cuando el mismo no es inherentemente increíble o improbable, pues cuando un testigo se contradice, lo que se pone en juego es su

credibilidad y es al juez de instancia a quien corresponde dirimir el valor de su restante testimonio. *Pueblo v. Cabán Torres, supra*, Pág. 656. Dicho de otro modo, el efecto de la contradicción se traduce en una cuestión de credibilidad a ser resuelta por el juez que entendió en la causa, ya que éste está en mejor posición para aquilatar adecuadamente los testimonios.

El apelante también entiende que es contradictorio que el testigo declare que no sabe la fecha exacta de los acontecimientos debido a que usaba mucha marihuana, mientras asegura, por otro lado, conocer las horas, nombres de los testigos, nombre de las armas y su calibre e incluso quién las usó. No obstante, según expuesto en la jurisprudencia, un adicto a drogas, testigo ocular de los hechos, puede declarar como testigo si demuestra que al momento de los hechos no estaban tan alteradas sus facultades como para no poder o querer observar diligentemente. *"Sus cualidades o dotes morales pueden afectar la credibilidad de su testimonio, pero no destruirlo como instrumento evidenciario". Pueblo v. Mendoza Lozada*, 120 D.P.R. 815, 820 (1988). Los detalles expuestos en las declaraciones de Rodríguez, en combinación con la prueba independiente que corrobora su testimonio, demuestran que el testigo observó lo ocurrido. Reiteramos lo antes expuesto referente a que la expresión de la fecha aparenta ser más un desliz mental que una prueba de falsedad.

No podemos concluir sin antes referirnos a la alegación de que el testigo ha mentido anteriormente ante las autoridades estatales y las federales y, más aún, cuando su declaración es la única que vincula al apelante con los sucesos delictivos. ■ La Regla 10(d) de Evidencia, 32 L.P.R.A. Ap. I, R. 10(d), establece que la evidencia directa que ofrezca un testigo que merezca entero crédito al juzgador será prueba suficiente de cualquier hecho, salvo que la ley otra cosa disponga. Prueba suficiente es aquélla que produce certeza o convicción moral en un ánimo no prevenido. Regla 10(c) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(c); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986).

Sea como fuere, el sólo testimonio de un coautor, creído más allá de duda razonable por el juzgador, es suficiente para sostener una convicción. Cf. *Pueblo v. Echevarría Rodríguez*, 128 D.P.R. 299, 318 (1991). Asimismo, el hecho de que un testigo sea tachado de *"mentiroso compulsivo"* no le incapacita como testigo; su efecto es afectar la credibilidad que debe merecerle su testimonio al juzgador. *Pueblo v. Echevarría Rodríguez, supra*, pág. 318. Enfatizamos el principio de que, en la medida en que los jueces de instancia y los jurados se encuentran en mejor posición de apreciar y aquilatar la prueba presentada, su apreciación merecerá gran deferencia de este Tribunal y no intervendremos con ella en ausencia de pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique. *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988), y casos allí citados; *Pueblo v. Márquez y Bermúdez*, 122 D.P.R. 93 (1988), y casos allí citados.

Durante los procedimientos conducentes a la presente apelación, el tribunal sentenciador, a diferencia de este foro, tuvo amplia y mejor oportunidad para analizar y adjudicar el asunto de la credibilidad. Además, tuvo una segunda oportunidad, mediante la vista referente a la solicitud de nuevo juicio, para evaluar al testigo Rodríguez y, luego de así hacerlo, denegó la solicitud de nuevo juicio y se mantuvo firme en su sentencia condenatoria. ■ Toda vez que no hemos encontrado elementos de pasión, prejuicio y/o parcialidad y en vista del análisis que antecede, no hay razón alguna para negar al Tribunal de origen la deferencia que se merece.

Tomando en consideración todos los factores antes expuestos, encontramos que no hay razón legalmente válida para intervenir con el dictamen emitido por el tribunal *a quo*. Los testimonios creídos por el tribunal y toda la prueba, en general, son suficientes en derecho para establecer la culpabilidad del acusado más allá de duda razonable.

Un examen sereno, detallado y desapasionado de la prueba no produce en nuestro ánimo *"insatisfacción o intranquilidad de conciencia". Pueblo v. Mendoza Lozada, supra; Pueblo v. Cabán Torres, supra.*

Por todo lo antes expuesto, confirmamos la sentencia condenatoria según emitida por el Tribunal de

Primera Instancia.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 2002 DTA 86**

**1.** Véanse, la Regla 194 de Procedimiento Civil, 34 L.P.R.A. Ap. III, R. 194, y la Regla 23(A) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, R. 23(A).

**2.** No pasemos por alto que esta prueba no fue presentada en el juicio, sino en la vista sobre la solicitud del apelante para que se le concediera un nuevo juicio, la cual fue denegada por el Tribunal apelado. De dicho dictamen, el apelante no acudió ante nos.

**3.** Véase Informe Médico-Forense, Autopsia 4547-92.

**4.** Véanse las notas al calce Nums. 2 y 5.

**5.** De ese dictamen, repetimos, el apelante no acudió ante este Tribunal. No puede, por lo tanto, pretender que la evidencia que desfiló en la vista de la solicitud de nuevo juicio, sea considerada tal y como si hubiese sido presentada en el juicio que culminó en la convicción y sentencia del apelante.